**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 27, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

WESLEY DALE VINCENT,

    Plaintiff - Appellant,

v.

AVA NELSON,

    Defendant - Appellee.

No. 20-8030

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 1:16-CV-00270-ABJ)**
_____

R. Todd Ingram, Metier Law Firm, Fort Collins, Colorado (Tom Metier, Metier Law Firm, Fort Collins, Colorado and C. John Cotton, Cotton Law Office, Gillette, Wyoming, with him on the briefs), for Plaintiff-Appellant.

Malcolm S. Mead, Hall & Evans, LLC, Denver, Colorado (Kenneth H. Lyman, Hall & Evans, LLC, Denver, Colorado and James C. Worthen, Hall & Evans, LLC, Casper, Wyoming, with him on the brief), for Defendant-Appellee.
_____

Before **HOLMES**, Chief Judge, **TYMKOVICH**, and **McHUGH**, Circuit Judges.
_____

**HOLMES**, Chief Judge.
_____

Plaintiff-Appellant Wesley Dale Vincent and Defendant-Appellee Ava Nelson were involved in a collision while working as coal-haul truck drivers at a mine in Campbell County, Wyoming. Mr. Vincent initiated a personal-injury case in

Wyoming federal district court. Following a two-week trial, a jury concluded that Ms. Nelson did not act with willful and wanton misconduct, and thus was not liable for Mr. Vincent's damages.

Mr. Vincent now challenges the district court's evidentiary rulings during trial, its denial of his pre-trial motion to compel the introduction of evidence regarding the mine's financial interest in the litigation, and the denial of his motion for a new trial.

Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** the district court's judgment.

## I.    FACTUAL BACKGROUND

Thunder Basin Mine (the "Mine") is an open-pit coal mine located in Campbell County, Wyoming. Thunder Basin Coal Company ("Thunder Basin Coal"), a wholly owned subsidiary of Arch Coal, operates the Mine. Haul-truck drivers transport the coal on unpaved roads from "the shovel," which digs the rock from the Mine's pit, to "the crusher," which breaks the coal into smaller chunks. Aplt.'s App., Vol. 6, at 19 (Trial Tr. Vol. IIa, dated Jan. 14, 2020); *id.*, Vol. 9, at 27, 54–55, 199 (Trial Tr. Vol. VII, dated Jan. 22, 2020).[1] Working in twelve-hour shifts, the drivers make multiple runs between the shovel and the crusher to keep the Mine operating 24/7. And, given that the Mine operates at night and lacks sources of illumination like streetlamps, the drivers operate in dimly lit conditions. That makes for dangerous work given the size of haul trucks. At 27-feet wide, 47-feet long, and

---

[1]    Because the page numbers of Appellant's Appendix are obscured in certain instances, this Opinion cites to the CM/ECF page numbers.

25-feet tall, haul trucks are so large that an average-sized adult male is shorter than the vehicle's rims. To accommodate the trucks' mammoth size and ensure a wide berth between passing rigs, haul roads are generally, at a minimum, 130-feet wide. Some roads, however, are significantly narrower, requiring coordination between passing drivers.

On the night of October 13, 2013, Ms. Nelson was several hours into her shift when Thunder Basin Coal put Mr. Vincent on the same route. As Ms. Nelson drove her haul truck up and out of the pit, Mr. Vincent drove down into it. When Mr. Vincent saw Ms. Nelson's truck coming in the opposite direction, he pulled over and parked his truck on the side of the road. In attempting to pass, at approximately 2:30 a.m., Ms. Nelson swiped the sideview mirror of Mr. Vincent's truck with her own and hit a tail pin that extended from his truck. Mr. Vincent claims to have suffered serious injuries due to this collision.

Shortly after the accident, two supervisors—Mike McGinty and Jack Steele—launched an investigation. Based on evidence collected at the accident scene, interviews, data from computers installed in the Mine's vehicles, and their own observations, Mr. McGinty and Mr. Steele concluded that Ms. Nelson was at fault:

> [Mr. Vincent] was indeed stopped at the time the trucks made contact. As [Ms. Nelson] approached the truck parked on the road, she thought since she had successfully met and passed another truck at the same narrow place in the road earlier that night, she decided to "go for it." Unfortunately, she wasn't far enough over and her truck made contact with [Mr. Vincent's] truck. After her truck hit his

truck, she stopped, and then resumed pulling forward.

*Id.*, Vol. 12, at 12 (Investigation Notes from the Ava Nelson/Dale Vincent Truck Accident, dated Oct. 13, 2013).  Ms. Nelson lost her job as a result of the accident.

Over three years later, in 2016, Mr. Vincent filed suit under the Wyoming Workers' Compensation Act against Ms. Nelson and three other Thunder Basin Coal employees.[2]  Mr. Vincent claimed that the accident resulted in "serious and life altering injuries," including "an umbilical hernia, injury to his appendix, . . . injuries to his back and neck," and "PTSD."  *Id.*, Vol. 2, at 80–81 (Dist. Ct. Order, filed Sept. 30, 2019).  Mr. Vincent sought approximately $3,000,000 in damages.  While Ms. Nelson disputed that figure, her principal defense turned on whether she acted willfully and wantonly when causing the accident.  Absent a finding of willful and wanton conduct, Wyoming law immunized Ms. Nelson from liability.  *See* Wyo. Stat. Ann. § 27–14–104(a).

Bearing on that "central" issue was "[t]he location of the crash" as it related to the width of the road at the site of the collision.  Aplt.'s App., Vol. 4, at 115 (Dist. Ct. Order, filed May 12, 2020); *id.*, Vol. 11, at 115 (Trial Tr. Vol. X, dated Jan. 27, 2020) (counsel for Mr. Vincent explaining to the jury that "[t]he dispute is the location").  More specifically, the parties disputed whether the collision occurred in "the narrows"—a straight stretch of the road where, even by the admission of Ms.

---

[2]    On April 11, 2019, Mr. Vincent stipulated to the dismissal of all defendants except Ms. Nelson.

Nelson's witnesses, safe passage would have been extremely challenging—or on a curve leading into a dogleg, where Ms. Nelson maintained there was adequate room to safely pass.

## A. The Evidence

Much of Mr. Vincent's appeal turns on trial testimony involving an aerial photograph (the "Aerial Photo") of the Mine taken prior to the collision. Ms. Nelson's three designated expert witnesses—Mr. Steele, Mr. McGinty, and Mr. Brandon Opfer—did not discuss the photograph during their respective depositions, and their expert designations did not specifically reference the photograph. Nevertheless, each used the photograph to formulate an opinion about the location of the accident.

### 1.    The Aerial Photo

At the beginning of trial, Ms. Nelson introduced the Aerial Photo—an aerial photograph of the Mine taken on September 24, 2013, that is, roughly three weeks *before* the accident. Thunder Basin Coal captures aerial photographs of the Mine every month to help it assess the amount of coal it has extracted. Ms. Nelson disclosed the Aerial Photo to Mr. Vincent in December 2018, one year prior to trial.

During trial, Mr. Vincent objected to the Aerial Photo's admission, arguing that it did not represent the condition or configuration of the Mine's roads on the date of the accident and thus could mislead the jury. Ms. Nelson acknowledged that because "surface mining road conditions change . . . what is in this photograph is not the same as what occurred on October 13th." Aplt.'s App., Vol. 5, at 194 (Trial Tr.

5

Vol. II, dated Jan. 14, 2020).  Nevertheless, she asked that the court admit the Aerial

Photo to "generally describe the area" and to aid the jury in understanding "where

[Mr. Vincent and Ms. Nelson] were coming and where they were going."  *Id.* at 194–

95.  The court agreed.

### 2.     Mr. Steele's Designation, Deposition, and Trial Testimony

Ms. Nelson designated Mr. Steele, one of the Mine's supervisors and accident

investigators, as an expert who could testify about Thunder Basin Coal's

"investigation into the accident."  *Id.*, Vol. 1, at 86–87 (Def.'s FED. R. CIV.

P. 26(a)(2) Expert Disclosure Statement, filed June 3, 2019).  The designation

provided that Mr. Steele's trial testimony would be "consistent with his deposition

testimony, previously taken in this matter," and it noted that he could look to "any

relevant documents, articles, and exhibits" to formulate an opinion.  *Id.* at 87.  Mr.

Steele did not discuss the Aerial Photo during his deposition, however.

At trial, Mr. Steele testified that, as a superintendent of operations, he was

responsible for coordinating the movement of the Mine's machinery and

investigating any accidents.  Mr. Steele explained that he arrived at the Mine a few

hours after the accident, at approximately 7:00 a.m.  By that time, workers had

cleared the trucks from the road.  However, other employees, including a late-night

superintendent, showed him where they found the trucks and where they believed the

accident had occurred.  Mr. Steele and the late-night superintendent then measured

6

the road by "stepping [it] off," and determined it was 75 to 80 feet wide.[3]  *Id*., Vol. 9, at 32.  Mr. Steele also interviewed Mr. Vincent, Ms. Nelson, and another driver who had driven the same route on the night of the accident.  Based on what he saw and heard, Mr. Steele prepared a detailed diagram of the access road and accident scene.

When Ms. Nelson asked Mr. Steele to identify the location of the accident based on the Aerial Photo, Mr. Vincent objected, arguing that such testimony exceeded the bounds of Mr. Steele's deposition testimony.  Overruling that objection, the district court permitted Mr. Steele to "testify as to where he was directed to go [when he arrived at the scene of the accident]; . . . where he looked; where he stepped off."  *Id.* at 47.

Mr. Steele confirmed that the pit—as it looked on the night of the accident—generally looked as depicted in the Aerial Photo, which was, again, taken some three weeks before.  And though he acknowledged that the width of the road might have changed somewhat during the three weeks between the Aerial Photo's date and the accident, the shovel and the crusher had not moved.  With the shovel and crusher functioning as fixed landmarks, Mr. Steele marked the location that he went to when he responded to the accident and "stepped off the distance."  *Id.* at 56.  He identified that location as "where the road turns," commenting that it was approximately "75 to 80 feet" wide.  *Id*. at 56.  Mr. Steele also testified that "there wasn't any doubt in

---

[3]      We understand this colloquialism to mean that Mr. Steele measured the width of the road by counting the number of steps it took to walk across it.

[his] mind" as to the location of the crash, which was "where [he] was shown it occurred." *Id*. at 143.

### 3.     Mr. McGinty's Designation, Deposition, and Trial Testimony

Ms. Nelson designated Mr. McGinty, the other accident investigator, as an expert who could testify about Thunder Basin Coal's "operation on the night [of the accident], and the operations of the haul trucks in the area where the . . . accident occurred." *Id.*, Vol. 1, at 86.  The designation further advised that Mr. McGinty could "rely on any relevant . . . exhibits to illustrate or support his" opinion testimony, and that his trial testimony would be consistent with that offered in his deposition. *Id.*  Like Mr. Steele, Mr. McGinty did not discuss the Aerial Photo during his deposition.  But he did explain that when he arrived at the scene, Ms. Nelson had parked her truck approximately 100 feet away from Mr. Vincent's truck, or about "100 feet . . . from the point of impact." *Id.* at 251–52 (Dep. of Michael J. McGinty, dated Feb. 11, 2019).  Mr. McGinty also discussed his measurements of the road, noting that he and a Thunder Basin Coal superintendent determined the road was "somewhere around 75 to 80 feet wide" after "stepp[ing] the road off" at the "point where the accident occurred." *Id.* at 255–56.

Mr. McGinty testified at trial that he arrived at the scene around 2:45 a.m., shortly after the accident occurred.  As he drove down the access ramp into the pit, Mr. McGinty could see Ms. Nelson's truck, which faced him with the headlights on. Though the trucks "were separated," Mr. McGinty could see that they were

positioned roughly as they were at the time of the collision: Mr. Vincent's "was headed in" while Ms. Nelson's "was heading out." *Id.*, Vol. 9, at 216.

At trial, Ms. Nelson asked Mr. McGinty to identify the "general area where the accident happened" on the Aerial Photo. *Id.* at 213.[4] Using the Aerial Photo, Mr. McGinty, like Mr. Steele, identified the location of the shovel and the crusher, and pointed to the place where the accident occurred, which was at or around where Mr. Vincent stopped his truck. Echoing Mr. Steele, Mr. McGinty opined that the road measured between 75 and 80 feet wide at the site of the accident, a determination he also reached by "stepping off" the road. *Id.* at 217.

### 4.    Mr. Opfer's Designation, Deposition, and Trial Testimony

Ms. Nelson designated Mr. Opfer—another Thunder Basin Coal employee—to testify about MineStar, a "computer program that takes information from the . . . computers installed on [the haul trucks] and generates information regarding the movement and use of the vehicles." *Id.*, Vol. 1, at 85. In line with this designation, Mr. Opfer was expected to testify about MineStar's "operation and use, and its application in connection to the accident." *Id.* Like Mr. Steele's and Mr. McGinty's designations, Mr. Opfer's designation stated that he could "rely on any relevant . . . exhibits to illustrate or support his testimony." *Id.* at 85–86.

---

[4]    The trial transcript states that Mr. McGinty provided "no audible response" following counsel's question. Aplt.'s App., Vol. 9, at 213. However, it appears based on the subsequent testimony in the transcript that Mr. McGinty pointed at a location on the Aerial Photo.

9

In his deposition, Mr. Opfer identified his title as "MineStar [S]upervisor" and testified that he was charged with ensuring that the "MineStar system is operating correctly," including supervising "dispatchers" and the "field techs who repair any broken items on the MineStar system." *Id.* at 217, 219 (Dep. of Brandon Opfer, dated Jan. 10, 2019).   He testified that "all of [Thunder Basin Coal's] haul trucks are equipped with a MineStar unit"—that is, "an onboard computer connected to a wireless network." *Id.* at 219–220.  According to Mr. Opfer, among other things, MineStar units provide locational information for the trucks: "So in realtime, near realtime, depending on how we had the machines configured onboard, they'll send a ping back to the office of where they are at for the dispatchers to identify their location." *Id.* at 221.

Mr. Opfer had before him MineStar GPS data regarding the locations of the haul trucks that were operated by Mr. Vincent and Ms. Nelson on the date of the accident, October 13, 2013.  Notably, however, Mr. Opfer elected to interpret this data against the background of the Mine's "digital mine model." *Id.* at 222.  As Mr. Opfer explained it:

> So we create a digital mine map of . . . where the road segment—where the road network is in our mine. And so as the trucks traverse across the mine site, they'll go through different waypoints that we use to connect road segments, and then as they enter and exit those waypoints, they will give us locations as well.

10

*Id.*; *see also id.* at 227 (agreeing with Mr. Vincent's counsel's statement that a "waypoint is . . . a physical location out in the field, which is represented by your designating that position . . . in the MineStar system").

The locational data was stored on what Mr. Opfer called "Gateway" files; a Gateway file is "a message that the onboard system generates." *Id.* at 222; *see id.* at 227 ("Gateway is just the type of file that we collect. In the MineStar environment, we call it a Gateway file."). Notably, as Mr. Opfer's testimony highlighted, only the Gateway files containing the haul-truck, locational information were available for the date of the accident—*not* the digital mine model. *See id.* at 228 (testifying that "the factual location of that truck [Mr. Vincent's truck] based on this Gateway file" was available for October 13, 2013, and "the same information" was available for Ms. Nelson's truck).

As for the unavailability of the digital mine model for the accident date, Mr. Opfer testified that the "mine model is dynamic," and Thunder Basin Coal "did not archive how the mine model was configured at that time [i.e., the date of the accident, October 13, 2013]." *Id.* at 227. And he elaborated in an exchange with Mr. Vincent's counsel:

> **Q:** Are you telling us that you have no images of the . . . Pit in the area where the collision occurred in the MineStar database?
>
> **A:** No.
>
> **Q:** No, you're not telling me that?

11

> **A:**    No, we do not have—the . . . MineStar software does not archive the digital mine model.

*Id.* at 228.

The upshot is that, though Mr. Opfer had "factual" GPS data for the haul trucks for the date of the accident, the digital mine model that captured the configuration of the Mine on October 13 no longer existed; so, Mr. Opfer could not say, based on the available digital mine model, with absolute precision, where in the Mine's configuration of roadways the parties' haul trucks collided on October 13. In particular, Mr. Opfer could not say where the haul trucks were *in relation to* the shovel or other physical objects in the Mine. In this regard, when asked by Mr. Vincent's counsel, if he could identify the location of the shovel that had loaded Ms. Nelson's truck shortly before the accident, Mr. Opfer admitted that he could not "[w]ith this information" because the digital map that he was using as the "background" for his locational analysis was saved in January 2019—shortly before his deposition. *Id.* at 228; *see id.* (agreeing with Mr. Vincent's counsel's assertion that "the background that shows us where the roads are and where the shovel and other waypoints are is not from October 13, 2013"). Mr. Opfer stated that, because the "[t]he digital mine model is updated in realtime" the model that he was using was "the only background information that we can get." *Id.*

However, after the start of trial but before he was scheduled to testify, Ms. Nelson asked Mr. Opfer if he could "superimpose the MineStar GPS data [i.e., the Gateway files data] onto the [Aerial Photo], and thereby pinpoint the location of the

accident." *Id.*, Vol. 4, at 116. Mr. Opfer stated that he could and, together with the Mine's engineering department, produced an exhibit to that effect. At Ms. Nelson's suggestion, the district court held a hearing "to discuss the new exhibit [she] wished to introduce through Mr. Opfer's testimony." *Id.* Mr. Vincent objected to the exhibit on the grounds that it was unreliable and should have been disclosed when Mr. Opfer was listed as an expert witness. The court sustained Mr. Vincent's objection but nevertheless ruled that Mr. Opfer would be permitted "[to] testify[] . . . and draw[] a diagram . . . showing the jurors the East Pit . . . of Black Thunder Mine and placing various items in that mine," including the "shovel, the defense view of where th[e] incident occurred, and the crusher and other objects; where these vehicles came to rest eventually after they collided." *Id.* (quoting Aplt.'s App., Vol. 11, at 6–7 (Trial Tr. Vol. IX, dated Jan. 24, 2020)).

At trial, Mr. Opfer presented testimony regarding the MineStar system. Consistent with the district court's ruling, and over Mr. Vincent's objection, he also "described the work he did with the Engineering Department to transpose the MineStar data on the [Aerial Photo], drew a diagram of the site and MineStar data, and ultimately placed pins on the [Aerial Photo], mirroring the crosshair locations [of the haul trucks] from the MineStar data." *Id.* at 117.

### 5. The Motion to Compel

Several months before trial, Mr. Vincent had moved to compel Ms. Nelson "to produce information regarding insurance coverage and the obligation of [Thunder Basin Coal] to indemnify [her] by paying a portion of the verdict." *Id.*, Vol. 2, at 58

13

(Pl.'s Mot. to Compel, filed Sept. 20, 2019).  Mr. Vincent alleged that Arch Coal,

Thunder Basin Coal's parent company, had $15,000,000 in insurance coverage, in

addition to a previously disclosed $5,000,000 policy covering occurrences of bodily

injury.  Mr. Vincent alleged that Arch Coal would have to pay a sizeable deductible

under the undisclosed policy before the insurance company would indemnify Ms.

Nelson.  Mr. Vincent maintained that discussing either Arch Coal or Thunder Basin

Coal's financial interest was "relevant to the bias and credibility" of Ms. Nelson's

designated experts, who were employed by Thunder Basin Coal or had just recently

retired.  *Id.* at 62.  In disagreeing, the district court concluded that "[t]o allow the

evidence requested by [Mr. Vincent] would be to risk confusing the jury on the

issues, potentially delaying the process, and causing the jury to decide the case on

considerations other than liability."  *Id.* at 128 (Dist. Ct. Order, filed Oct. 28, 2019).

### B.    The Jury's Verdict & Post-Trial Briefing

After the jury found that Ms. Nelson "was not liable for [Mr. Vincent's]

damages," *id.*, Vol. 4, at 117; *see also id.*, Vol. 2, at 130 (Verdict Form, filed Jan. 27,

2020), Mr. Vincent filed a motion for a new trial, raising three arguments, *see id.*,

Vol. 3, at 20–29 (Pl.'s Mem. in Support of Mot. for New Trial, filed Feb. 26, 2020).

First, in light of the Aerial Photo and testimony at trial, he argued that Mr. Opfer had

been "[e]ffectively [t]ransformed" from a Rule 26(a)(2)(C) non-retained expert

witness to a Rule 26(a)(2)(B) retained expert witness.  *See id.* at 20.  Accordingly,

with respect to Mr. Opfer, Mr. Vincent maintained that Ms. Nelson was required to

provide a written report, but failed to do so.  Relatedly, Mr. Vincent contended that

the court wrongly permitted Mr. Opfer to testify beyond his designation. Second, as Mr. Vincent reasoned, Mr. Opfer's "[s]urprise [u]ndesignated [e]xpert [t]estimony" violated *Smith v. Ford Motor Co.*, 626 F.2d 784 (10th Cir. 1980), the district court's pretrial order, Local Rules, and the Federal Rules of Civil Procedure. Aplt.'s App., Vol. 3, at 21–27. And third, Mr. Vincent argued that the court should have permitted him to challenge the credibility and motives of witnesses based on the Mine's financial interest in the case.

In his reply brief in support of the new trial motion, Mr. Vincent attached the affidavit of Benjamin Cotton, a GPS expert who had never testified or been identified in the case, to challenge Mr. Opfer's methodology and conclusions with respect to the location of the crash. The district court struck Mr. Cotton's affidavit from the record.

Ultimately, the court denied Mr. Vincent's motion for a new trial. Starting first with Mr. Opfer's testimony, the court rejected the premise of Mr. Vincent's motion: that Mr. Opfer's testimony exceeded the bounds established by his designation. As the court put it, Mr. Opfer's testimony regarding the "application of the MineStar data," *see id.*, Vol. 4, at 131, corresponded with his designation, which provided that he had "experience and expertise regarding MineStar, . . . and its application in connection to the accident," *id.* at 115. Yet, even if Mr. Opfer had exceeded his designation, the court distinguished Mr. Vincent's case from our decision in *Smith*, and, in any event, found that "the *Smith* factors" were "not present." *Id.* at 128.

The district court likewise dismissed Mr. Vincent's argument regarding the preclusion of evidence concerning Thunder Basin Coal's financial interest in the case "for the same reasons described" in its previous rulings on Mr. Vincent's Motion to Compel. *Id*. at 129. In those rulings, the court excluded evidence relating to Thunder Basin Coal's financial interests because it was "not a party to this case," which was "about Ms. Nelson's conduct during the incident." *Id.*, Vol. 2, at 128. Allowing evidence about Thunder Basin Coal's financial interests would "risk confusing the jury on the issues, potentially delaying the process, and causing the jury to decide the case on considerations other than liability." *Id.* Finally, it struck Mr. Cotton's ill-timed affidavit, reasoning that if Mr. Vincent "wanted to rely on an affidavit to challenge Ms. Nelson's characterization or the accuracy of [the expert testimony in question], . . . he should have done so in his initial motion [for a new trial]." *Id.*, Vol. 4, at 114.

Mr. Vincent timely appealed from the district court's various evidentiary rulings, order granting Ms. Nelson's motion to strike, and order denying Mr. Vincent's motion for a new trial.

## II.    JURISDICTION

As an initial matter, we must address our jurisdiction to hear this appeal. We previously issued a *sua sponte* order for Mr. Vincent to provide further information that would be sufficient to confirm the existence of diversity of citizenship between

16

the parties.[5]  We explained that Mr. Vincent's Complaint stated that he was a *resident* of Franklinton, Louisiana; however, that information did not suffice to establish diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  *See Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1238 (10th Cir. 2015) ("An individual's residence is not equivalent to his domicile and it is domicile that is relevant for determining citizenship.").  Accordingly, we requested that Mr. Vincent file a response providing his state of *citizenship* at the time he commenced this litigation in the District of Wyoming.

Here, Mr. Vincent filed his initial Complaint on October 31, 2016, and filed his First Amended Complaint on July 7, 2017.  Like his initial Complaint, Mr. Vincent's First Amended Complaint only spoke of his Louisiana residency, not his citizenship.  But Mr. Vincent's response to our order confirms the existence of diversity jurisdiction—both when he filed the initial Complaint and when he filed the First Amended Complaint.[6]

---

[5]    Ms. Nelson is a citizen of Wyoming.

[6]    Though our *sua sponte* order that inquired regarding the existence of subject-matter jurisdiction referred to Mr. Vincent's initial Complaint, strictly speaking, it is ordinarily the proper course to "look to the amended complaint to determine jurisdiction." *Rockwell Int'l. Corp. v. United States*, 549 U.S. 457, 473–74 (2007); *see also United States ex rel. Little v. Triumph Gear Sys., Inc.*, 870 F.3d 1242, 1252 (10th Cir. 2017) ("[T]he amended complaint—not the original complaint—is the starting point for the jurisdictional determination."); *Parker v. WI Waterson, LLC*, 790 F. App'x 926, 929 (10th Cir. 2019) (unpublished) (looking to the plaintiff-appellant's first amended complaint to determine whether federal question and diversity jurisdiction existed); 14AA Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 3702.4, Westlaw (database updated Apr. 2022) ("Courts look to the amended complaint to determine jurisdiction."); *cf. Rockwell Int'l Corp.*, 549 U.S. at 473 (noting that, as to the existence of subject-matter

17

Specifically, by affidavit, Mr. Vincent asserts that on February 24, 2016, he moved from Wyoming to Louisiana. He states that he has remained in Louisiana since February 2016 and intends to reside in Louisiana permanently. Mr. Vincent also attached an affidavit from Charlene Canada, who prepared a Preliminary Rehabilitation Assessment and Valuation in connection with this litigation, stating that Mr. Vincent moved from Wyoming to Louisiana prior to August 18, 2016. Finally, Mr. Vincent attached excerpts from his April 2019 deposition testifying that he is from Louisiana, that he moved to Wyoming for employment in 2011, and that his doctor is in Louisiana.

Mr. Vincent's response confirms that he was a citizen of Louisiana both when he filed his initial Complaint and his First Amended Complaint: he resided in Louisiana with the intent to remain there. *See Siloam Springs*, 781 F.3d at 1238; *Smith v. Cummings*, 445 F.3d 1254, 1259–60 (10th Cir. 2006) ("To establish domicile in a particular state, a person must be physically present in the state and intend to remain there."). Diversity jurisdiction therefore exists, and we may proceed to the merits of Mr. Vincent's appeal.

---

jurisdiction, "[t]he state of things and the originally alleged state of things are not synonymous"). However, this proposition has no material impact on our resolution of the jurisdictional inquiry here: as noted, the relevant jurisdictional averment was not changed in the First Amended Complaint; when he filed both the initial Complaint and the First Amended Complaint, Mr. Vincent was a citizen of Louisiana and thus diversity jurisdiction existed under 28 U.S.C. § 1332(a).

### III.　DISCUSSION

Having determined that we may exercise jurisdiction under § 1332(a), we turn to the merits of Mr. Vincent's appeal.　Mr. Vincent contends that the district court abused its discretion in three ways: first, in permitting the undesignated testimony of Ms. Nelson's three expert witnesses regarding the location of the crash relative to the Aerial Photo; second, through various pretrial evidentiary rulings, holding that Mr. Vincent could not engage in discovery regarding, or introduce evidence of, the Mine's financial interest in the case; and third, in striking the affidavit of Mr. Vincent's GPS expert, Mr. Cotton.　We conclude that each of these arguments is without merit.

### A.　Standard of Review

"We review a district court's decisions on the admission or exclusion of evidence, including expert testimony, for abuse of discretion." *Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1054 (10th Cir. 2013).　"A district court abuses its discretion 'when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 968 (10th Cir. 2001) (quoting *Copier ex rel. Lindsey v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998)).　"The abuse-of-discretion standard is 'one which we have traditionally understood to mean that we will reverse a determination only if the court exceeded the bounds of permissible choice, given the facts and the applicable law in the case at hand.'" *Prager*, 731 F.3d at 1054 (quoting *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007)).　The considerable deference

inherent in this standard stems from a recognition that "in many cases there will be a range of possible outcomes the facts and law at issue can fairly support." *Prager*, 731 F.3d at 1054. Consequently, "rather than pick and choose among them ourselves, we will defer to the district court's judgment so long as it falls within the realm of these rationally available choices." *Id.*

Similarly, "[a] district court has broad discretion in deciding whether to grant a motion for a new trial." *Harvey ex rel. Harvey v. Gen. Motors Corp.*, 873 F.2d 1343, 1346 (10th Cir. 1989). "A new trial is appropriate only where [a] claimed [evidentiary] error substantially, and adversely, affects the rights of a party." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1297 (10th Cir. 1998).

### B.     The Experts' Testimony

The crux of Mr. Vincent's argument is that the district court erred by allowing Ms. Nelson's witnesses to provide testimony that used the Aerial Photo to illustrate the accident's location, supposedly without Ms. Nelson satisfying the applicable expert-witness disclosure requirements. This allegedly improper admission, Mr. Vincent maintains, was devastating to his case.

We are not persuaded for several reasons. First, Mr. McGinty's and Mr. Steele's testimony pointing to the location of the accident on the Aerial Photo was lay testimony based on personal experience and observation and thus not subject at all to expert-witness disclosure requirements. Even if that was not so, however, we would conclude that both men testified within the confines of their designations. And, even if their testimony departed from their designations, the district court did

20

not abuse its discretion in permitting the testimony under our decision in *Smith v. Ford Motor Co*.  The testimony from Mr. Opfer, likewise, fell within the scope of his designation, and, in any event, we would be hard pressed to discern any abuse of discretion under *Smith* in the court's admission of it.

### 1.    Mr. McGinty's and Mr. Steele's Testimony

### a.    Lay Opinion Testimony

As an initial matter, Mr. Vincent's argument presupposes that the testimony at issue was expert testimony rather than lay testimony.  With respect to Mr. Steele and Mr. McGinty, we disagree.

The Federal Rules of Evidence "distinguish between expert and lay testimony, *not between* expert and lay witnesses." *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002) (emphasis added).  Lay opinion testimony must be: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701(a)–(c).  By contrast, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702.  Because the key distinctions here relate to the nature of the testimony, as opposed to the category of witnesses, "it is possible for the same

21

witness to provide both lay and expert testimony in a single case." FED. R. EVID. 701 advisory committee notes to 2000 amendment.

However, certain disclosure requirements attach to witnesses who intend to deliver expert (as opposed to lay) testimony. Retained expert witnesses, or employees "whose duties . . . regularly involve giving expert testimony," must file detailed written reports that include "(i) a *complete* statement of all opinions the witness will express and the basis and reasons for them"; "(ii) the facts or data considered by the witness in forming them"; "(iii) any exhibits that will be used to summarize or support them"; (iv) the witness's qualifications, publications, and previous experience giving testimony; (v) a list of all other cases in which the witness testified as an expert at trial or deposition in the previous four years; and (vi) a statement of the compensation to be paid for the study and the testimony in the case. FED. R. CIV. P. 26(a)(2)(B)(i)–(vi) (emphasis added). As we have explained, Rule 26(a)'s retained-expert requirements are "necessary to allow the opposing party 'a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'" *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (quoting FED. R. CIV. P. 26(a)(2) advisory committee notes to 1993 amendment).

These "extensive" disclosure requirements, however, do not apply to non-retained expert witnesses. FED. R. CIV. P. 26 advisory committee notes to 2010 amendment ("This [Rule 26(a)(2)(C)] disclosure is considerably less extensive than the report required by Rule 26(a)(2)(B)."). Non-retained expert witnesses need only

22

disclose "the subject matter on which [he or she] is expected to present evidence" and "a *summary* of the facts and opinions to which [he or she] is expected to testify." FED. R. CIV. P. 26(a)(2)(C)(i)–(ii) (emphasis added).

And no disclosure provision applies to a designated expert witness's *lay* testimony. *See, e.g.*, *United States v. Kearn*, 863 F.3d 1299, 1311–12 (10th Cir. 2017). In *Kearn*, for instance, we concluded that the *testimony* of two law enforcement officers that certain images were child pornography was not expert testimony because their observations "did not go beyond the realm of common experience." *Id.* For that reason, we rejected the defendant's argument that the government circumvented Rule 26's disclosure requirements through the officers' testimony. *See id.*; *cf.* FED. R. EVID. 701 advisory committee notes to 2000 amendment (stating that Rule 701's requirements "ensure[] that a party will not evade the expert witness disclosure requirements set forth in FED. R. CIV. P. 26 . . . by simply calling an expert witness in the guise of a layperson").

We conclude, at the outset, that though designated as non-retained experts, Mr. Steele and Mr. McGinty *both* provided lay testimony based on their personal perceptions, *as well as* expert testimony based on their specialized knowledge of mining operations. Notably, their testimony identifying the location of the accident on the Aerial Photo—which Mr. Vincent objects to on appeal—fell squarely within the first bucket (i.e., lay testimony).

Mr. Steele recounted factual details from his investigation at the accident scene—not conclusions based on specialized or technical knowledge. Mr. Steele had

23

considerable experience at the Mine when he testified that the "general layout of the . . . [p]it . . . remained the same" "in the . . . 20 days between when [the Aerial Photo] was taken and when th[e] accident occurred." Aplt.'s App., Vol. 9, at 51. Relying on that personal knowledge, Mr. Steele "generally describe[d]" the area by identifying the crusher, shovel, and the "location that [he] went to" and "stepped off" when measuring the width of the road. *Id.* at 54–56. Based on both his personal experience and reports he received from colleagues, Mr. Steele pointed to the accident's "specific[] . . . location" on the Aerial Photo. *Id.* at 56. As such, his testimony is properly characterized as lay testimony that is not subject to any of Rule 26's expert-disclosure requirements.

That same conclusion applies to Mr. McGinty's testimony. He arrived at the scene of the accident in its immediate aftermath, witnessed the post-accident location of the trucks, interviewed the drivers about what had transpired, and personally stepped off the road to measure it. Using the Aerial Photo, Mr. McGinty identified various fixed landmarks at the Mine on the date of the accident: "where the crusher would have been," "where the shovel would have been," and "where [he] went to visibly see Ava Nelson and Dale Vincent's haul trucks." *Id.* at 212. Ms. Nelson then asked him to identify "the *general area* where the accident happened." *Id*. at 213 (emphasis added). In response, Mr. McGinty identified the accident site on the Aerial Photo. Whether characterized as fact testimony or lay opinion testimony, Mr. McGinty's identification of the accident site on the Aerial Photo stemmed from a combination of "personal knowledge" acquired through firsthand perceptions and "a

process of reasoning familiar in everyday life"—and, thus, was not the stuff of expert testimony. FED. R. EVID. 701 advisory committee notes to 2000 amendment.

Accordingly, the district court did not abuse its discretion in overruling Mr. Vincent's objection. Far from "requir[ing] the special skill and knowledge of an expert witness," Mr. Steele's and Mr. McGinty's testimony that located the accident on the Aerial Photo stayed well within "the realm of common experience"— supported by personal observations, perceptions, and factual information gathered during their respective investigations. *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011) (quoting *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979)); *cf. United States v. Cristerna-Gonzalez*, 962 F.3d 1253, 1259 (10th Cir. 2020) ("[A] law-enforcement officer's testimony based on knowledge derived from the investigation of the case at hand is typically regarded as lay testimony.").

### b.    Rule 26(a)(2)(C)

That said, even if these two men were testifying as non-retained experts, both Mr. Steele and Mr. McGinty testified within the confines of their designations. In Mr. Vincent's view, however, the district court erred in permitting Mr. McGinty and Mr. Steele to use the Aerial Photo in their testimony because their disclosures failed to contemplate any such use. *See* Aplt.'s Opening Br. at 35.[7] According to Mr.

---

[7]    Mr. Vincent does not argue that Mr. McGinty's and Mr. Steele's overall testimony regarding the location of the accident was undesignated or otherwise improper.

Vincent, Rule 26(a)(2)(C) required Ms. Nelson to "file a designation including . . . the assertion that Mr. McGinty was going to stand up and try to confirm" Mr. Steele's identification of the accident site on the Aerial Photo. *Id.*

But, as we have indicated, Rule 26(a)(2)(C) is not so demanding. In offering Mr. Steele and Mr. McGinty as non-retained experts, Ms. Nelson was required only to put Mr. Vincent on notice as to the "subject matter on which [they were] expected to present evidence" and to provide a "summary of the facts and opinions" to which they would be expected to testify. FED. R. CIV. P. 26(a)(2)(C). A "summary" is customarily defined as "[a]n abridgment" of a fuller accounting of material. *Summary*, BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, a Rule 26(a)(2)(C) "disclosure is considerably less extensive than the report required by Rule 26(a)(2)(B)." FED. R. CIV. P. 26 advisory committee notes to 2010 amendment. Indeed, the advisory notes caution against requiring "undue detail," as witnesses testifying under Rule 26(a)(2)(C) generally "have not been specially retained and may not be as responsive to counsel as those who have." *Id.*

And though only a few of our sister circuits appear to have encountered challenges akin to Mr. Vincent's—in published and unpublished[8] decisions—they seem largely to have faulted parties only when they have filed disclosures "so

---

[8]    We recognize that the unpublished decisions cited herein—even ones that panels of our circuit have issued—are not controlling authority or otherwise binding on us; however, we cite them as persuasive aids in resolving the material issues before us. *See, e.g.*, *Bear Creek Trail, LLC v. BOKF, N.A.*, 35 F.4th 1277, 1282 n.8 (10th Cir. 2022); *United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

generic, unhelpful, and boilerplate [that] they could apply to . . . virtually any case."
*Torrez v. D. Las Vegas, Inc.*, 773 F. App'x 950, 951 (9th Cir. 2019) (unpublished) (omission in original) (quoting magistrate judge's order); *see Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 738–39 (9th Cir. 2021) (concluding that a party did not comply with Rule 26(a)(2)(C) where it "did not summarize the facts and opinions to which [its] experts would testify as required by Rule 26(a)(2)(C)(ii)"); *Cripe v. Henkel Corp.*, 858 F.3d 1110, 1113 (7th Cir. 2017) (ruling that witness designations of non-retained experts failed to comply with Rule 26 where the party offered no summary of facts and opinions); *Goncharenko v. Royal Caribbean Cruises, Ltd.*, 734 F. App'x 645, 646–47 (11th Cir. 2018) (unpublished) (per curiam) (concluding that the district court did not abuse its discretion when striking appellant's non-retained expert witnesses where appellant's "summary" merely stated that the witnesses would testify that an accident caused appellant's injuries). *But see Amezcua v. Boon*, 754 F. App'x 551, 553 (9th Cir. 2018) (unpublished) (concluding that appellants violated Rule 26 when they "provided only a general overview of the topics upon which each of their four non-retained expert witnesses would testify").

With Rule 26's provisions and committee notes in mind, and taking into consideration the foregoing caselaw, we conclude that Mr. McGinty's and Mr. Steele's trial designations contained sufficiently detailed "summar[ies] of the facts and opinions to which [they] [were] expected to testify." FED. R. CIV. P. 26(a)(2)(C)(ii). Mr. McGinty's designation stated, in relevant part, that he would "testify about his participation in the post-accident activities conducted by [Thunder

Basin Coal]" and "the operations of the haul trucks in the area where the subject accident occurred." Aplt.'s App., Vol. 1, at 86. Significantly, Mr. McGinty's designation provided notice that he may "base any opinion on his education, experience and training, and rely on any relevant documents, articles, and exhibits to illustrate or support his testimony." *Id*. Mr. Steele's designation similarly stated that he would testify as to Thunder Basin Coal's "investigation into the accident" and "about his participation in the . . . investigation of [the accident]." *Id.* at 87. Furthermore, his designation similarly advised that he may "rely on any relevant documents, articles, and exhibits to illustrate or support his testimony." *Id*. Both designations also provided that Mr. Steele and Mr. McGinty would testify consistent with their deposition testimony. *See id*. at 86–87.

True to their designations, Mr. Steele and Mr. McGinty testified at length at trial on direct and cross examination about the investigation—including the location of the crash. Both witnesses used the Aerial Photo—a relevant document and trial exhibit that Mr. Vincent had in his possession for over a year before trial—to illustrate their testimony about the location of the collision, as they perceived it from their investigations. In short, their trial testimony, in our view, was clearly in line with the summaries of their trial designations. Accordingly, we conclude that the district court did not abuse its discretion in permitting Mr. McGinty and Mr. Steele to use the Aerial Photo to support their testimony about the accident's location.

28

### c.    *Smith v. Ford Motor Company*

Though we neither determine that the objected-to testimony qualifies as expert testimony, nor that it exceeds the scope of its designations even if it was expert testimony, we nevertheless find it prudent to address Mr. Vincent's final argument as to these two witnesses: that the district court erred under our decision in *Smith v. Ford Motor Co.*, in allowing the admission of "testimony" purportedly not within the scope of the witnesses' designations. *See* Aplt.'s Opening Br. at 38. We conclude that this argument is without merit.

Drawing on the prior related work of the Third Circuit, we specified in *Smith* four factors "which should be considered in determining whether a district court has abused its discretion in excluding, or in [the case of *Smith*] allowing, testimony not specified in the pretrial order":

> (1) the prejudice or surprise in fact of the [opposing] party . . ., (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Smith*, 626 F.2d at 797 (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n.*, 559 F.2d 894, 904–05 (3d Cir. 1977), *abrogated on other grounds by Goodman v. Lukens Steel Co.*, 777 F.2d 113, 120 (3d Cir. 1985)).

Mr. Vincent deems *Smith* to be applicable here by analogy—where the objected-to expert testimony ostensibly exceeded the bounds of the witnesses'

29

designations. As to the prejudice component of the first factor, Mr. Vincent contends that Mr. Steele's and Mr. McGinty's use of the Aerial Photo amounted to undesignated testimony that prejudiced him; indeed, he goes so far as to claim that it "devastat[ed]" his case. Aplt.'s Opening Br. at 39–40. However, we perceive any prejudice to Mr. Vincent from the admission of this testimony to be limited, and the court's admission of it does not signal an abuse of discretion. First, the accident's location was principally relevant insofar as it spoke to the road's width. As such, the Aerial Photo supplemented—not supplanted—Mr. Steele and Mr. McGinty's otherwise unobjected-to testimony regarding the road's width. Both witnesses testified that the road's width at the perceived accident site measured between 75 and 80 feet. Perhaps the Aerial Photo was "prejudicial"—but only in the sense that "[v]irtually all relevant evidence is prejudicial." *United States v. Archuleta*, 737 F.3d 1287, 1293 (10th Cir. 2013). Mr. Steele's and Mr. McGinty's first-hand testimony about their road measurements—to which Mr. Vincent does not object—arguably proved far more damaging to his case than the introduction of the Aerial Photo. Indeed, it directly undermined his assertion that the road was patently too narrow for Ms. Nelson to pass in her 27-foot-wide haul-truck.

And second, as the district court observed, "[t]he jury . . . still could have found [that Ms. Nelson's] actions did not meet th[e] [willful and wanton misconduct] standard *regardless* of where the crash occurred." Aplt.'s App., Vol. 4, at 132. "While [Mr. Vincent's] counsel portrayed the width and location as tantamount to a

30

finding of willful and wanton misconduct, the jury was not required to accept that argument and apply the facts to the standard in that way." *Id.*

As for the surprise component of the first factor, Mr. Vincent cannot credibly argue that Ms. Nelson's attempt to use the Aerial Photo in support of Mr. Steele's and Mr. McGinty's testimony "surprise[d]" him. *Smith*, 626 F.2d at 797. Ms. Nelson disclosed the Aerial Photo to Mr. Vincent over a year before trial. Moreover, she put him on notice that both Mr. Steele and Mr. McGinty might look to "relevant documents . . . to illustrate or support" their testimony about "the area where the subject accident occurred" and their "investigation into the accident." Aplt.'s App., Vol. 1, at 86–87. Based on the foregoing, then, we can hardly say that the district court abused its discretion in determining that Mr. Vincent had not shown prejudice or surprise.

Moreover, the second and third *Smith* factors also weigh against Mr. Vincent. He "could have attempted to cure [any] prejudice by deposing" Mr. Steele and Mr. McGinty about the Aerial Photo outside the presence of the jury or "sought a continuance from the district court" to better prepare for cross-examination. *Wern v. Davis*, 99 F.3d 1151, 1996 WL 621991, at *7 (10th Cir. Oct. 28, 1996) (unpublished); *see MacCuish v. United States*, 844 F.2d 733, 737 (10th Cir. 1988) ("[W]hile [the appellant] objected to [the witness's] testimony, she made no motion for a continuance at that time nor does she demonstrate other efforts to cure any alleged prejudice, although she could have made such efforts."); *cf. Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1411 (10th Cir. 1988) ("Our cases show that when a

31

party requests a new trial on the basis of surprise testimony it must be able to show surprise, prejudice, and an attempt to cure the prejudice such as a motion for a continuance."). With respect to Mr. Steele's and Mr. McGinty's use of the Aerial Photo, Mr. Vincent has no answer for his failure to request a continuance.

Nor did the admission of Mr. Steele's and Mr. McGinty's testimony regarding the Aerial Photo cause any disruption to "the orderly and efficient trial of the case." *Smith*, 626 F.2d at 797; *see also Prager*, 731 F.3d at 1058 (finding that "[n]either the district court's ruling that allowed . . . [the] challenged testimony, the cross examination . . ., nor the testimony of the rebuttal witness caused any disruption" to the trial). And as to the final *Smith* factor, Mr. Vincent fails to furnish any evidence of bad faith in the admission of the Aerial Photo, itself. *See Smith*, 626 F.2d at 797.

In sum, we conclude that, even treating the challenged testimony as expert testimony outside the confines of Mr. Steele and Mr. McGinty's designations, the district court—contrary to Mr. Vincent's suggestion—did not abuse its discretion under the *Smith* framework in permitting the testimony to be admitted.

## 2. Mr. Opfer's Testimony

We now turn to Mr. Opfer's testimony. There can be no reasonable dispute that Mr. Opfer delivered expert testimony based on specialized knowledge of the MineStar system when he used MineStar-generated data to place the crash location on the Aerial Photo.[9] However, like Mr. Steele's and Mr. McGinty's testimony, Mr.

---

[9]    Ms. Nelson's argument that Mr. Opfer's testimony applying the MineStar data to the Aerial Photo constituted lay testimony because GPS technology

Opfer's testimony fell within the confines of his designation. Moreover, in our view, the district court did not abuse its discretion in determining that Mr. Opfer's trial testimony was not at odds with his deposition testimony. Further, because Mr. Vincent was neither surprised nor prejudiced by Mr. Opfer's testimony regarding the location of the crash, we cannot conclude that the district court acted outside "the bounds of permissible choice." *Prager*, 731 F.3d at 1054 (quoting *McComb*, 519 F.3d at 1053).

### a.   Mr. Opfer's Testimony Was Consistent With His Designation

Echoing his arguments regarding Mr. Steele's and Mr. McGinty's testimony, Mr. Vincent contends that "[Mr.] Opfer was not designated to use [the] MineStar data to place the trucks at a physical location." Aplt.'s Opening Br. at 36. He likewise maintains that Mr. Opfer "had been designated to testify that the 2019 'digital mine model' that was the basis of his testimony 'is the only background information that [Thunder Basin Coal] c[ould] get.'" *Id.* (quoting Aplt.'s App., Vol. 1, at 228). Therefore, Mr. Vincent urges us to conclude that Ms. Nelson's failure to disclose the extent of Mr. Opfer's testimony—related to the Aerial Photo—violated Rule 26(a)(2)(C), and that the district court therefore abused its discretion in admitting his testimony.

---

is commonplace and because Mr. Opfer personally observed Thunder Basin Coal's engineering team transfer the MineStar GPS data onto the Aerial Photo is unavailing. The record is clear that mapping MineStar data onto the Aerial Photo required the Mine's engineering department's expertise. Therefore, Mr. Opfer's opinion testimony was based on "scientific, technical, or other specialized knowledge" governed by Rule 702, not Rule 701. FED. R. EVID. 701(c).

33

However, we agree with the district court that Mr. Opfer's testimony fell within the scope of his designation.  Mr. Opfer's disclosure stated that he had "experience and expertise regarding MineStar, its operation and use, and *its application in connection to the accident* giving rise to th[e] lawsuit."  Aplt.'s App., Vol. 1, at 85 (emphasis added).  It further provided that "Mr. Opfer is expected to testify as to his education, training, and experience related to [Thunder Basin Coal's] use of the MineStar system," consistent with his deposition testimony.  *Id*.

Consistent with that designation, Mr. Opfer offered testimony about MineStar's "application . . . to the accident": he took the MineStar data and applied it to a photograph of the location where Mr. Steele and Mr. McGinty testified the accident occurred.  Because the width of the road was at issue, the parties "unavoidably" had to determine the accident's location.  *Id.*, Vol. 4, at 130.

Mindful of the advisory committee's admonition that courts "must take care against requiring undue detail" in non-retained expert disclosures, FED. R. CIV. P. 26 advisory committee notes to 2010 amendment, and guided by our deferential standard of review, we find no abuse of discretion in the district court's conclusion that:

> [a]lthough the specific details of the testimony applying the MineStar data to the [Aerial Photo] were not included in Mr. Opfer's designation or deposition, [Mr. Vincent] knew Mr. Opfer could testify to the location of the haul trucks, as they existed within the digital mine model.  The fact that [Ms. Nelson] took this a step further [by having Mr. Opfer apply the MineStar data coordinates to the Aerial Photo by memory] did not take the testimony outside of the designation but fell within the description of Mr. Opfer's expertise regarding the

34

Mine[S]tar data's application in connection to the crash.

Aplt.'s App., Vol. 4, at 130.

### b.    Mr. Opfer's Testimony Did Not Contradict His Deposition Testimony

Nor are we persuaded, under our deferential abuse-of-discretion standard, that the district court erred in finding that Mr. Opfer's trial testimony did not contradict his deposition testimony.  Mr. Vincent specifically takes issue with Mr. Opfer's deposition statement that "[t]he digital mine model is updated in realtime and that is the only background information that we can get." *Id.*, Vol. 1, at 228.  He claims that this statement was inconsistent with Mr. Opfer's trial testimony, which used the Aerial Photo as background information.

As we have detailed, *supra*, Mr. Opfer's statement (highlighted by Mr. Vincent) arose during an extended discussion of the MineStar system, as Mr. Vincent's counsel attempted to clarify whether the digital mine model that Mr. Opfer was using to offer his opinions depicted the configuration and circumstances of the Mine on the date that Mr. Opfer secured the model—i.e., January 19, 2019—or on the date of the haul-truck accident, October 13, 2013.  Mr. Opfer explained that, because the digital mine model was constantly updating, the digital mine model that captured the configuration and circumstances of the Mine on the accident date, October 13, no longer existed and, because his opinions regarding the GPS data

35

involved the use of a digital-mine-model background,[10] the best he could do was to use a version of the model captured around the time of the deposition (i.e., January 19).

Considering the broader context of Mr. Opfer's statement, then, the district court quite reasonably could determine that Mr. Opfer merely intended to convey that the digital mine model he was using in his deposition was the only background information that he could get *from the MineStar system*—given the ephemeral nature of digital mine models—not that it was the only background information that he could use in depicting the location of the accident. Therefore, there was no contradiction between this deposition testimony of Mr. Opfer and his trial testimony, which was predicated in part on background information that the Aerial Photo supplied—that is, background information from a source *other than the MineStar system*.[11] *Cf.* Aplt.'s App., Vol. 4, at 132 ("Applying the location data to a

---

[10]    Recall that Mr. Opfer used in his testimony Gateway files containing "factual" GPS data from the date of the accident, Aplt.'s App., Vol. 1, at 228, and these files presented the data in part with reference to waypoints incorporated into the digital mine model, *see id.* at 222.

[11]    In a brief footnote, Mr. Vincent states that "[i]n asking Opfer to do work specifically for the case, Defendant also transformed him into a witness 'retained or specially employed to provide expert testimony in the case,' requiring a report under Rule 26(a)(2)(B)." Aplt.'s Opening Br. at 37 n. 32. Mr. Vincent provides no additional reasoning or legal authority for this contention, and we therefore decline to consider it on appeal. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."); *United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1237 n.8 (10th Cir. 1997) ("[I]t is the appellant's responsibility to tie the salient facts, supported by specific record citation, to [his]

compatible aerial photograph does not mean Mr. Opfer's deposition was misleading; it means that he was simply not asked a question about applying the data to background *outside* the [MineStar] System.").

### c. The District Court Did Not Abuse Its Discretion Under *Smith*

Mr. Vincent urges us to find that the admission of Mr. Opfer's testimony applying the MineStar data to the Aerial Photo failed to satisfy the requirements that we set forth in *Smith*.  But even assuming that Mr. Opfer's testimony exceeded his designation, we discern no abuse of discretion by the district court under *Smith*. More specifically, Mr. Vincent has not shown that Mr. Opfer's testimony ran afoul of the first *Smith* factor by surprising or prejudicing him.

The district court limited its analysis to the first *Smith* factor, focusing primarily on whether Mr. Opfer's use of the Aerial Photo prejudiced Mr. Vincent; the court concluded that it did not.  We similarly confine our analysis to the first *Smith* factor.

We are unconvinced that Mr. Opfer's testimony was prejudicial in any meaningful sense to Mr. Vincent.  First of all, though counsel's discovery of Mr. Opfer's ability to superimpose the MineStar GPS data onto the Aerial Photo occurred mid-trial, the district court specifically took measures to minimize any prejudice by holding a hearing outside the presence of the jury regarding the proposed evidence. *Cf. Smith*, 629 F.2d at 798–99 (finding prejudice where defendant was granted only a

---

legal contentions." (second alteration in original) (quoting *Schaede v. Boeing Co.*, 72 F.3d 138, 1995 WL 736464, at *1 (10th Cir. Dec. 13, 1995) (unpublished))).

ten-minute recess to prepare cross-examination regarding the expert's undisclosed causation testimony). In that hearing, Mr. Vincent was given the opportunity to cross-examine Mr. Opfer, and did so at length—challenging the reliability and accuracy of superimposing the MineStar GPS data onto the Aerial Photo at trial.

Furthermore, while Mr. Opfer's testimony did concern the important issue of the accident's location—as the district court rightly noted—this case was distinguishable from *Smith* on the issue of prejudice because the expert there provided the *only* testimony on the key issue (i.e., causation), whereas here "the jury weighed testimony and argument from many sources" on the location issue. Aplt.'s App., Vol. 4, at 132–33 (relying on our discussion of *Smith* in *Greenwood v. McDonough Power Equip., Inc.*, 731 F.2d 690, 697 (10th Cir. 1984)). More specifically, other witnesses offered persuasive and consistent testimony regarding the location of the accident and, relatedly, the width of the road at the site of the accident—most notably, Mr. Steele and Mr. McGinty, who measured the road by stepping it off in the minutes and hours immediately following the accident (Mr. McGinty while the trucks were still in their post-accident resting locations).

Consequently, insofar as we assume that Mr. Opfer's Aerial Photo testimony exceeded the scope of his designated testimony, its prejudicial potential was limited because there was ample other evidence concerning the same or similar subject matter that the court admitted into evidence *without* objection by Mr. Vincent. Unlike *Smith*, then, Mr. Opfer's testimony was not the only testimony bearing on the important issue of location.

38

Moreover, it is notable that *both* sides claimed that Mr. Opfer's testimony supported their theory regarding the location of the crash.  *See* Aplt.'s App., Vol. 11, at 129 (Trial Tr. Vol. X, Pl.'s Closing Arg., dated Jan. 27, 2020) (Mr. Vincent's counsel arguing in closing that Mr. Opfer's testimony "conclusively located" the site of the crash "in the narrows"); *id*. at 148 (Trial Tr. Vol. X, Def.'s Closing Arg., dated Jan. 27, 2020) (Ms. Nelson's counsel arguing in closing that Mr. Opfer's testimony "conclusively resolved" the accident's location).  This serves to undercut any claim of prejudice.  *Cf. Moss v. Feldmeyer*, 979 F.2d 1454, 1461 (10th Cir. 1992) ("[Appellant], having relied on [the] autopsy to support her argument . . . cannot now challenge . . . testimony predicated on . . . the autopsy on which she relied.").

On the issue of surprise, Mr. Opfer's challenged testimony did not cite any new data or factual material, much less new subject matter; he simply "put [two] pieces" of admissible evidence together, which were available to both parties. Aplt.'s App., Vol. 4, at 133.  Importantly, the facts and data underlying his testimony—the Aerial Photo and the MineStar data—were disclosed more than a year before trial, and Ms. Nelson disclosed Mr. Opfer as a non-retained expert witness six months before trial.  We agree with the district court: "Plaintiff's counsel could have requested Mr. Opfer to" apply the MineStar data to the Aerial Photo or, "[a]lternatively, because they had access to this information for an ample time before trial, they could have taken independent initiative to further understand and apply the MineStar data." *Id.* at 132.  They did neither.

39

To be sure, we do not require that a party anticipate—and forestall—all possible ways an expert could apply facts and data. But under these specific circumstances—where the testimony at issue was both predictable and challenged at a full hearing before being presented at trial—Mr. Vincent's claim of surprise rings hollow. *Cf. Perry v. Winspur*, 782 F.2d 893, 895 (10th Cir. 1986) (noting that expert witness disclosures "should be construed liberally to embrace topics inherent in the expected testimony described therein"); *cf. also Stone v. First Wyo. Bank*, 625 F.2d 332, 348 (10th Cir. 1978) (noting that the "pretrial order 'should be liberally construed to embrace all of the legal and factual theories inherent in the issues defined therein'" (quoting *Century Refin. Co. v. Hall*, 316 F.2d 15, 20 (10th Cir. 1963))).

Thus, under the specific facts and circumstances of this case, we are not persuaded that Mr. Vincent was so surprised or prejudiced by the inclusion of Mr. Opfer's Aerial Photo testimony as to place the district court's decision outside "the realm of . . . rationally available choices." *Prager*, 731 F.3d at 1056 (quoting *McComb*, 519 F.3d at 1053). And, importantly, in the absence of prejudice or surprise, challenged testimony "does not run afoul of *Smith's* directive," and there is no abuse of discretion. *Prager*, 731 F.3d at 1056; *see also Greenwood*, 731 F.2d at 697 (concluding that *Smith* does not apply where "there has been a failure to establish that [the challenged] testimony was prejudicial"). Thus, we cannot conclude that the district court rendered an "arbitrary, capricious, whimsical, or manifestly unreasonable judgment," *Ralston*, 275 F.3d at 968, in determining that Mr. Vincent

failed to show surprise or prejudice—defeating his challenge under *Smith* to Mr. Opfer's use of the Aerial Photo.

### C.     The District Court Did Not Abuse Its Discretion In Denying The Motion To Compel

Mr. Vincent next contends that the district court erred in various pretrial rulings holding "that [Mr. Vincent] could not fully discover, introduce evidence of, or impeach regarding the Mine's financial interest" in the case.  Aplt.'s Opening Br. at 50.  Reviewing for abuse of discretion, we reject this argument.

In denying Mr. Vincent's motion to compel, the district court concluded that the risk of confusion to the jury outweighed any probative value of the indemnity agreement Mr. Vincent sought to introduce.   Specifically, the court reasoned that because this was a liability case in which the core issue was Ms. Nelson's conduct— not the Mine's "involvement" or "tangential interest" as a non-party—"to allow the evidence requested by Plaintiff [i.e., Mr. Vincent] would be to risk confusing the jury on the issues, potentially delaying the process, and causing the jury to decide the case on considerations other than liability." Aplt.'s App., Vol. 2, at 128.  Further, the court reasoned that, because Ms. Nelson did not intend to claim impecunity or limited means to pay a judgment—which the court would not have permitted in any event— the evidence was not relevant for the purpose of rebutting that defense. *See id*. at 124–25.

In challenging the district court's decision, Mr. Vincent underscores his belief that the court wrongly precluded him from exposing the potential bias or motive of

former and current Mine employees that testified.  But he neither identifies any

caselaw supporting the idea that the district court's decision constituted an abuse of

discretion, nor engages with the court's reasoning that admitting the indemnity

agreement would confuse the jury.[12]  *See* Aplt.'s Opening Br. at 50–51.  We therefore

would be within the bounds of our own discretion not to consider this challenge

further.  *See Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015)

("The first task of an appellant is to explain to us why the district court's decision

was wrong."); *Reedy v. Werholtz*, 660 F.3d 1270, 1275 (10th Cir. 2011) ("The

argument section of Plaintiffs' opening brief does not challenge the court's reasoning

on this point. We therefore do not address the matter."); *see also United States v.*

*Hardwell*, 80 F.3d 1471, 1492 (10th Cir. 1996) (ruling that a litigant "waived this

issue by failing to make any argument or cite any authority to support his assertion").

Regardless, we discern no abuse of discretion in the district court's reasoning.

"The court may exclude relevant evidence if its probative value is substantially

outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the

jury, [and] undue delay."  FED. R. EVID. 403.  And a decision to exclude evidence

---

[12]    Mr. Vincent does cite Jury Instruction No. 35, which instructed the jury
to "carefully scrutinize all testimony given," including considering "each witness's
. . . motive and state of mind."  Aplt.'s Opening Br. at 51 (citing Aplt.'s App., Vol. 2,
at 174).  But the question before us—the discoverability and admissibility of
evidence—is an entirely distinct, antecedent inquiry from how the jury should assess
the evidence that is ultimately discovered and admitted.  Moreover, Mr. Vincent's
suggestion that evidence relevant to the jury's deliberation must be admitted
disregards the court's fundamental obligation to weigh the probative value of
evidence against potential prejudice.  *See* FED. R. EVID. 403.

under Rule 403 will not be reversed absent a clear abuse of discretion. *See, e.g.*, *Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515, 1526 (10th Cir. 1997); *see also Monfore v. Phillips*, 778 F.3d 849, 854 (10th Cir. 2015) (noting that the district court's discretion in evidentiary rulings under Rule 403 is "particularly" wide (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008))). Further, evidence regarding insurance coverage "is not admissible to prove whether the person acted negligently or otherwise wrongfully." FED. R. EVID. 411. While it is true that such evidence may be admitted for other purposes, including proving a witness's bias or prejudice, *see id.*, it must be regarded with particular caution, *see Burke v. Regalado*, 935 F.3d 960, 1021 (10th Cir. 2019) (observing that Rule 411 "has its basis in the belief that [insurance] evidence is of questionable probative value or relevance and is often prejudicial," as well as "the feeling that knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds" (first quoting *Charter v. Chleborad*, 551 F.2d 246, 248 (8th Cir. 1977), and then quoting FED. R. EVID. 411 advisory committee notes to 1972 proposed rules)), *and* its probative value must be weighed against potential prejudice, *see Palmer v. Krueger*, 897 F.2d 1529, 1538 (10th Cir. 1990).

Here, the district court cited the correct legal standard before weighing the probative value of the evidence against the risk of confusing the issues, misleading the jury, or unduly delaying the proceedings, and concluded that "even if the evidence bears some relevance to the issues argued by Plaintiff [i.e., Mr. Vincent], the value of the evidence for those purposes is outweighed by the prejudice it would

cause." Aplt.'s App., Vol. 2, at 127. This analysis and ruling are well within the permissible scope of the court's discretion.

###### D. The District Court Did Not Err In Striking The Cotton Affidavit

Finally, we reject Mr. Vincent's argument that the district court erred in striking an affidavit by Mr. Cotton. In Mr. Vincent's reply brief in support of his motion for a new trial, he attached the affidavit of Mr. Cotton (the "Cotton Affidavit" or "Affidavit"), a retired Special Forces Officer "with experience in plotting GPS coordinates onto real world locations." Aplt.'s Opening Br. at 48. Mr. Cotton had not previously testified or been identified in the case. The Affidavit stated that the MineStar location coordinates were not "standard" GPS coordinates and required expertise "beyond the average commercial GPS user's ability and resources." Aplt.'s App., Vol. 4, at 85–86. Importantly, it also stated that "data provided by Defendant [i.e., Ms. Nelson] did not contain sufficient information" to plot the MineStar location coordinates "on overhead imagery," and it challenged the accuracy of Mr. Opfer's opinion as to the location of the crash. *Id*. at 87–88.

The district court struck the Affidavit from the record. *See id.* at 113–14. In issuing its ruling, the district court said that Ms. Nelson's arguments seeking to transpose the MineStar data onto the Aerial Photo should have come as "no surprise" to Mr. Vincent; accordingly, he should have presented in his motion many of the arguments that he subsequently raised in the reply brief and in the Affidavit. *Id.* at 114. In short, the court reasoned that, if Mr. Vincent "wanted to rely on an affidavit

44

to challenge Ms. Nelson's characterization or the accuracy of [the expert testimony in question], . . . he should have done so in his initial motion." *Id*.

Mr. Vincent now contends that because neither Wyoming's Local Rules nor the Federal Rules of Civil Procedure *prohibit* the submission of affidavits with reply briefs, the district court erred in striking the Cotton Affidavit. Further, he urges that the district court applied an erroneous standard in striking the Affidavit based on its conclusion that Mr. Vincent could have and should have filed it with his initial motion for a new trial.

However, Mr. Vincent's arguments misapprehend the relevant Federal Rule, as well as the breadth of the district court's discretion. Federal Rule of Civil Procedure 59(c) provides that "[w]hen a motion for a new trial is based on affidavits, they *must* be filed with the motion." FED. R. CIV. P. 59(c) (emphasis added). That requirement is squarely implicated here. The Cotton Affidavit challenged the reliability of Mr. Opfer's testimony and its underlying methodology—arguments that presented ostensible bases for a new trial and had been discussed at length by the parties. The district court did not err in declining to consider the Cotton Affidavit's contentions because Mr. Vincent was obliged to present the Affidavit in connection with his initial motion.

To be sure, Rule 59(c) also provides that the "court *may* permit reply affidavits." *Id.* (emphasis added). But "may" does not mean "must." Indeed, the Supreme Court "has 'repeatedly observed' that 'the word 'may' *clearly* connotes discretion.'" *Biden v. Texas*, --- U.S. ----, 142 S. Ct. 2528, 2541 (2022) (quoting

45

*Opati v. Republic of Sudan*, --- U.S. ----, 140 S. Ct. 1601, 1609 (2020)); *see United States v. Bowden*, 182 F.2d 251, 252 (10th Cir. 1950) ("The use of the word 'may' in a statute will be construed as permissive and to vest discretionary power . . . ."). Thus, while Rule 59(c) does not categorically prohibit the filing of affidavits with reply briefs, the district court here was not stripped of its discretion to determine that the Cotton Affidavit came too late and thus should not be considered. And, in our view, the court did not abuse its discretion in reaching the conclusion that the Affidavit came too late. For similar reasons, we reject Mr. Vincent's argument under Wyoming Local Rule 7.1(b)(2)(c) because that rule, like the federal rule, neither requires nor disallows affidavits in support of a reply brief; therefore, the rule leaves decisions regarding the allowance of affidavits in such circumstances to the discretion of the district court, which it did not abuse here. [13]

Moreover, we have routinely declined to find an abuse of discretion where, in similar circumstances, district courts have determined that affidavits should have been presented with earlier briefing. *Cf. Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (finding no abuse of discretion where the district court declined to consider two affidavits submitted with a motion to reconsider that could have been presented in prior briefing); *Price v. Philpot*, 420 F.3d 1158, 1167–68 (10th Cir.

---

[13] We note that Mr. Vincent failed to raise any argument with respect to Wyoming Local Rule 7.1(b)(2)(c) before the district court, and he does not argue under the plain-error rubric on appeal. Therefore, we are free to deem this argument to be effectively waived. *See, e.g.*, *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1259–60 (10th Cir. 2018). In any event, as we note, the argument fails on the merits.

2005) (noting that "a [district] court may, in its discretion, elect not to consider a delayed affidavit" and finding no abuse of discretion in the district court's refusal to consider evidence that was first filed as an attachment to the plaintiff's motion to reconsider); *cf. also Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 n.3 (10th Cir. 1998) (declining to consider affidavits filed in connection with a FED. R. CIV. P. 60(b) motion because movant failed to allege that she could not obtain the affidavits prior to entry of summary judgment).

Nor does any ostensible relevance of the Cotton Affidavit alter our analysis. A district court may exercise its discretion to exclude otherwise relevant evidence based on timeliness, redundancy, and other equitable considerations. *See, e.g.*, *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1288–89 (10th Cir. 2010) (holding that the "district court's exclusion of [a] late affidavit" that a party sought to use to supplement its reply brief was not "a clear error of judgment" warranting reversal); *Hook v. Regents of Univ. of Cal.*, 394 F. App'x 522, 532 (10th Cir. 2010) (unpublished) (concluding that "it was not an abuse of discretion for the district court to exclude" an affidavit, notwithstanding its relevance).

The district court expressly considered Mr. Vincent's argument that it *may* permit an affidavit attached to a reply brief and that it should do so because of the alleged misrepresentations made in Ms. Nelson's response to the new trial motion. In an exercise of its discretion, however, the court declined to consider the Cotton Affidavit. We cannot say that the court abused its discretion in doing so; its decision did not exceed the permissible bounds of its discretion.

47

## IV.    CONCLUSION

Accordingly, for the foregoing reasons, we **AFFIRM** the district court's judgment.