**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 28, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

 Plaintiff - Appellee,

v.

LARRY G. KOCH,

 Defendant - Appellant.

No. 10-5135
(D.C. No. 4:10-CR-00048-CVE-1)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **GORSUCH, HOLLOWAY**, and **McKAY,** Circuit Judges.


 Larry Koch appeals a jury's verdict finding him guilty of conspiracy to

commit bank fraud.  Mr. Koch admits others committed bank fraud but disputes

that he knowingly participated in their conspiracy.  Alternatively, Mr. Koch

argues his conviction should be overturned because the government failed to

indict him sooner than it did.  To rule in Mr. Koch's favor on the first score

would require us to disregard a substantial amount of incriminating evidence the

jury was free to credit.  To rule for Mr. Koch on the second score would require

---

 [*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

us to disregard existing circuit and Supreme Court precedent. Neither of these things, of course, is within our lawful powers to do.

This case began when Eric Johnson decided he wanted to buy the Red Arrow Marina from Brad Carson. Located on the Grand Lake of the Cherokees in Oklahoma, the marina is a popular spot with fishermen and water sports enthusiasts alike. And the chance to own the marina represented a dream come true for Mr. Johnson — a chance to return to the place he grew up and run a business that didn't require him to travel away from his family. He saw an advertisement for the marina in the *Wall Street Journal* and decided it had to be his.

Problem was, the marina cost $1.75 million and Mr. Johnson didn't have the money. So Mr. Johnson and Mr. Carson hatched a plan. Mr. Carson agreed to manufacture false documentation to create the *appearance* that Mr. Johnson owned 50,000 shares of stock in Autumn Home Care, another company Mr. Carson owned. Mr. Carson drew up documents valuing the phony stock at $350,000. The point of the plot was to allow Mr. Johnson to obtain a loan to finance the purchase of the marina using the stock as a 20% down payment. For their scheme to work, though, Mr. Johnson and Mr. Carson still needed a bank to extend Mr. Johnson a loan.

That's where Mr. Koch entered the picture. Mr. Johnson approached Mr. Koch, then a vice president at the Bank of Oklahoma, seeking a loan. Mr. Koch

told Mr. Johnson that the bank would only consider his loan if it was guaranteed in part by the Small Business Administration. And that's where things hit a snag. The SBA required a cash down payment; stock wouldn't do. Mr. Koch called Mr. Johnson and Mr. Carson to tell them that the stock wouldn't work and the loan needed a "cash injection."

Where to get the cash? Mr. Carson had an idea. He proposed that he and Mr. Johnson "swap checks." Appellant App. at 859. Mr. Carson explained that he would write Mr. Johnson a check, Mr. Johnson would write him a check back in the same amount as the down payment for the marina, and "these checks would cancel electronically out in cyber land." *Id.* at 860. Mr. Johnson expressed concern about the plan — he didn't want to be "in trouble over a hot check." *Id.* at 859. Mr. Koch heard and participated in this conversation, going so far as to assure Mr. Johnson the idea would work — and to add that, if Mr. Johnson and Mr. Carson carried it out, "he didn't want to know anything about it." *Id.* at 861.

The idea did work, at least for a time, and it appears Mr. Koch knew all about it. Mr. Carson went ahead and wrote Mr. Johnson a check for $350,000 on his account at the Bank of Oklahoma. At close of business on the day he wrote the check, however, Mr. Carson's account only held $8,074.35 in cash and it had held no more than $30,000 over the preceding three months. Mr. Johnson took the check from Mr. Carson and went home. He soon got a call from Mr. Koch. Mr. Koch said he understood from Mr. Carson that Mr. Johnson was feeling

uncomfortable with the "situation." *Id.* at 863. Mr. Koch gave Mr. Johnson his home phone number and the next morning, around 5:00 a.m., Mr. Johnson says he called Mr. Koch at home. Mr. Koch's wife testified that she and her husband never received Mr. Johnson's call, but Mr. Johnson remembers talking to Mr. Koch and asking him whether there was any guarantee that the check swap would work. Mr. Johnson recalls Mr. Koch responding: "if you don't want to do this, don't. I'm just telling you it'll work." *Id.* at 864. Mr. Johnson testified that Mr. Koch's renewed assurance calmed his nerves, convincing him to go through with the plan.

And he did. Thinking that the canceling of checks might be easier if he drew his check on an account at a different bank, Mr. Johnson decided after speaking to Mr. Koch to open up a new checking account at a new bank with Mr. Carson's check and another $100 in cash. He went down to the First National Bank of Grove, two blocks away from the Bank of Oklahoma, and spoke to the branch president, Mr. Hamilton. Mr. Hamilton was curious about the $350,000 check Mr. Johnson sought to deposit so he called Mr. Koch to ask if Mr. Carson's Bank of Oklahoma check was good. Mr. Koch said it was. After depositing Mr. Carson's check at First National with Mr. Hamilton's approval, Mr. Johnson met Mr. Carson at the Bank of Oklahoma, where he gave Mr. Carson a $350,000 check written on his new First National account.

It was this check that constituted the necessary "cash" down payment for

the loan. With it, the loan soon closed and Mr. Johnson came to own the marina. As it happened, however, he never made a payment on the loan. In September 2000, this led the Bank of Oklahoma to file a "Suspicious Activity Report" with the authorities. This, in turn, led to an FBI investigation. And in April 2010, nine years and eleven months after the loan closed, the government finally indicted Mr. Johnson and Mr. Koch.

In response, Mr. Koch moved to dismiss the indictment, arguing that the government's delay in bringing charges violated due process. The district court denied the motion, Mr. Johnson eventually pleaded guilty, and Mr. Koch proceeded to trial. At trial, the jury convicted Mr. Koch of a single count of conspiracy, finding that the conspiracy's object was to commit bank fraud on the Bank of Oklahoma, in violation of 18 U.S.C. § 1344(2).

Before us, Mr. Koch argues first and foremost that the jury received insufficient evidence as a matter of law to suggest that he participated in the conspiracy to defraud the Bank of Oklahoma. To sustain a conviction for conspiracy in this circuit, the government must show "(1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006). To find that the objective of the conspiracy was bank fraud in particular, the jury must have found

that the co-conspirators intended to "knowingly provide[] materially false information in order to induce the loan." *United States v. Hollis*, 971 F.2d 1441, 1452 (10th Cir. 1992).

For his part, Mr. Koch does not dispute that Mr. Johnson and Mr. Carson agreed to violate the law, or that the members of the conspiracy were interdependent. Neither does he dispute that the object of the putative conspiracy was to defraud the Bank of Oklahoma into advancing a loan on false pretenses. Instead, as we understand him, he disputes only whether there was sufficient evidence for the jury to conclude either that he knew this essential objective of the conspiracy or that he knowingly and voluntarily participated in the conspiracy (elements 2 and 3 above). In reviewing challenges to the sufficiency of the evidence on these elements we may ask only whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found as the jury did. *United States v. Rakes*, 510 F.3d 1280, 1284 (10th Cir. 2007).

Regarding his knowledge of the objective of the conspiracy, sufficient evidence existed for a jury to conclude that Mr. Koch knew Mr. Johnson and Mr. Carson wanted to obtain a loan from the Bank of Oklahoma on false terms. Mr. Koch himself testified that the SBA demanded a cash down payment of $350,000. *See* Appellant App. at 1057. There is also sufficient evidence that Mr. Koch knew neither Mr. Johnson nor Mr. Carson had that much cash and needed to kite checks to make it appear otherwise. As for Mr. Johnson, he testified that he told

-6-

Mr. Koch he didn't have the necessary cash and the jury could have credited his testimony. *See id.* at 858. As for Mr. Carson, he wrote Mr. Johnson a check on his Bank of Oklahoma account, an account that only held $8,074.35 at the close of business the day before the loan closed and $8,746.85 on the day of the closing. *Id.* at 967. In the two months prior, the account held no more than $30,000. *See id.* at 965-66. To be sure, Mr. Koch testified that he believed Mr. Carson's account had more than $350,000 in cash by virtue of Mr. Johnson's check from First National. *See id.* at 1062; 560. But for Mr. Carson's account to receive $350,000 from Mr. Johnson's, Mr. Johnson had to have $350,000 in his account to give. So that takes us right back to Mr. Johnson who (again) told Mr. Koch that he didn't have the money. Simply put, a rational jury could believe that Mr. Koch knew Mr. Johnson and Mr. Carson were engaged in a classic check kiting scheme — passing checks they knew they didn't have cash to cover — in order to induce the bank into issuing a loan it would not have otherwise issued. The fact that Mr. Koch at one point told the men that "he didn't want to know anything about" their plan to exchange checks only underscores the point.

Mr. Koch stresses that he had no idea about *another* unlawful aspect of the conspiracy — the creation of phony Autumn Home Care stock. For all he knew, Mr. Koch says, the stock was entirely legitimate and valuable. But be this as it may, it is beside the point. The object of the conspiracy was always to defraud the Bank of Oklahoma into supplying a loan on false pretenses. Initially, Mr.

-7-

Carson and Mr. Johnson tried to achieve this by means of persuading the bank to accept phony stock as down payment. When that ploy didn't work, the evidence shows that Mr. Koch became aware of their effort to achieve the same end by using equally phony checks. Put simply, he may not have been aware of the original means his co-conspirators planned to use to achieve their objective, but he certainly became aware of that objective later when they involved him in alternative means to achieve the same end.

For many of the same reasons, there also was sufficient evidence that Mr. Koch voluntarily participated in the conspiracy. First, Mr. Koch voluntarily participated by assuring Mr. Johnson that swapping checks would work, an assurance that Mr. Johnson testified emboldened him to go through with the scheme. *See* Appellant App. at 866. Second, Mr. Koch told Mr. Hamilton that Mr. Carson's check would clear, thus helping to ensure that Mr. Johnson could open a new account at First National and write a check on that account. *Id.* at 1062-63. Third, Mr. Koch concealed the check swap from his supervisor, John Anderson, who signed off on the loan. Although Mr. Koch testified that he told Mr. Anderson everything, *id.* at 1063-64, Mr. Anderson did not recall such a conversation on the witness stand. To the contrary, Mr. Anderson testified that if Mr. Koch had told him that the buyer and seller were simply trading checks he never would have approved the loan. *Id.* at 1019-20. The jury could have believed Mr. Anderson's testimony and concluded that Mr. Koch knowingly

concealed the check swap from the bank, as well as the fact that there was no real cash down payment for the loan, thus facilitating the conspiracy's fraudulent objective in critical ways.

Even if there was sufficient evidence to sustain his conviction, Mr. Koch argues that the district court committed reversible error when it declined to dismiss the indictment against him. He points to the fact that nine years and eleven months passed between the closing of the loan and the government's indictment, a long time by anyone's reckoning. Mr. Koch acknowledges that the statute of limitations for conspiracy to commit bank fraud is ten years, and so his prosecution fell within the period prescribed by statute. *See* 18 U.S.C. § 3293. Neither does he dispute that the statutory limitations period generally comports with due process. Instead, he argues that the pre-indictment delay in this particular case, though still resulting in an indictment within an otherwise generally permissible limitations period, violated due process because of facts unique to it.

The test for assessing when a pre-indictment delay within the statute of limitations period violates due process has its origin in *United States v. Lovasco*, 431 U.S. 783 (1977). This circuit has read *Lovasco* to authorize dismissal of an indictment if the defendant can show two things: "[1] actual prejudice resulting from preindictment delay and . . . [2] the delay was purposefully designed to gain tactical advantage or to harass." *See United States v. Comosona*, 848 F.2d 1110,

1113 (10th Cir. 1988) (quotation omitted).

Both aspects of this test pose a problem for Mr. Koch. Taking the second aspect first, Mr. Koch acknowledges that there is no evidence the government intentionally delayed its indictment in this case, let alone for an improper reason. Neither does Mr. Koch even contend that the government's delay was the result of reckless misconduct. At most, he alleges only "gross negligence" on the part of the authorities. Yet even on that score the district court disagreed, expressly finding, after receiving the testimony of two agents assigned to the case, that the delay was "due to the [FBI's] legitimate investigative priorities," Appellant App. at 294, and Mr. Koch offers us no reason to think this finding clearly erroneous.

That leaves Mr. Koch to urge that we scrap the test articulated in *Comosona* and find that prejudice can, standing alone and without even proof of the government's negligence, suffice to establish a due process violation. We appreciate the candor and vigor with which counsel makes this argument, but a panel of this court is not free to disregard the precedent of this circuit. *See, e.g.*, *Mediola v. Holder*, 585 F.3d 1303, 1310 (10th Cir. 2009). And even if we could do so in another case, two independent considerations would cause us to hesitate in this one.

First, the Supreme Court in *Lovasco* instructed that "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the

prejudice to the accused." 431 U.S. at 790. Indeed, the Court cautioned that a contrary rule would encourage prosecutors to subordinate a search for the truth to speed and risk inducing the filing of charges in haste that further investigation would have shown unwise. *Id.* at 794-95. And the Court explained that it "would be most reluctant to adopt a rule which would have these consequences absent a clear constitutional command to do so." *Id.* at 795. Mr. Koch gives us no reason to think his case provides any exception from these general rules and considerations.

Second and separately, even if prejudice alone could be enough to warrant relief, it is lacking in this case. Everyone before us accepts that, when it comes to showing prejudice, the defendant bears the burden of proving that the government's delay *actually* prejudiced him; speculative surmise about what the evidence *might* have shown but for the government's delay is not enough. *United States v. Colonna*, 360 F.3d 1169, 1177 (10th Cir. 2004). In this case, however, the district court found that Mr. Koch "fail[ed] to explain *how* this evidence" — that is, the evidence lost to him as a result of the government's delay — "would [have] assist[ed] his defense." *See* Appellant App. at 289-90. And with this assessment we cannot disagree. To be sure, Mr. Koch notes that some significant witnesses (*e.g.*, Mr. Carson) died during the course of the FBI investigation and their testimony was lost. Yet, he has offered no non-speculative reason to conclude that these witnesses would have been anymore helpful to him than those

-11-

that survived and provided testimony distinctly adverse to him (*e.g.*, Mr.

Johnson). *See United States v. Trammell*, 133 F.3d 1343, 1351 (10th Cir. 1998)

(defendant did not show actual prejudice where he did "not specifically allege

how [dead] witnesses' testimony would have been of benefit to his case").

Similarly, although he argues he was deprived the benefit of evidence from lost

records and faded memories, he provides nothing more than speculation that any

of those records or memories would have proven exculpatory rather than

inculpatory.  As a result, and as the district court found, Mr. Koch has failed to

carry his burden of proving *actual* prejudice.

The judgment of this district court is affirmed.


ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge