FILED
United States Court of Appeals
Tenth Circuit

**August 6, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MILTON BOUTTE,

    Defendant - Appellant.

No. 22-2079
(D.C. No. 1:17-CR-03338-JMC-SCY-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT[*]**
_____

Before **HOLMES**, Chief Judge, **McHUGH**, and **EID**, Circuit Judges.
_____

A jury found Milton Boutte guilty of conspiracy to defraud the United States

under 18 U.S.C. § 286 and conspiracy to commit wire fraud under 18 U.S.C.

§§ 1343, 1349.  On appeal, Boutte brings approximately twenty different

constitutional, evidentiary, and sentencing challenges.  We determine each to be

meritless or frivolous.  For the following reasons, we affirm.

**I.**

Serving as the director for the Big Crow Program Office, Milton Boutte

provided electronic warfare services to the United States Army.  When the Army

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

withdrew funding for Big Crow in 1999, the program sustained itself by working for other agencies through congressional earmarks. And when the program struggled to sustain itself in 2004, Boutte retained George Lowe to lobby Congress to direct additional appropriations to the Big Crow Program Office. The arrangement was simple: In exchange for appropriations, Boutte promised to pay Lowe $15,000 per month, plus a percentage of any additional funds Lowe secured.

The problem with the arrangement came down to where the money funding Lowe's paycheck came from. Boutte directed Joe Diaz, owner and operator of a government-funded contractor called Miratek Corporation, to pay Lowe for the lobbying services he had rendered. But Miratek's contract only allowed it to provide administrative support services to Big Crow. Given that lobbying did not fit in that job description, Diaz, Lowe, and others had to convert Lowe's invoices into fictitious hourly invoices—all eventually paid for by the federal government.

Lowe directed millions of already-existing federal funds to Big Crow—so much that Miratek could not cover up the fraudulent payments to Lowe anymore. Yet the scheme continued. Boutte demanded that another contractor pass an additional $300,000 to Lowe via fraudulent invoices.

The jig was up in 2020 when a grand jury charged Boutte with conspiracy to defraud the United States under 18 U.S.C. § 286 and conspiracy to commit wire fraud under 18 U.S.C. §§ 1343, 1349. At trial, the government submitted an overwhelming amount of evidence to prove its case. Most crucial of the evidence, according to the government, were Boutte's email to Lowe initiating a lobbying agreement; Lowe's

2

testimony that he entered the agreement with Boutte to lobby for Big Crow; and an exhibit summarizing payments to Lowe matching the payment structure that Lowe described. Also crucial was a defense witness's testimony that Boutte admitted to promising Lowe 10% of any new funding he secured, to asking Miratek employee Ron Unruh to find a way to pay Lowe in the absence of a contract, and to asking a principal of a contractor for help paying Lowe.

Based on this, among other evidence, the jury found Boutte guilty of both counts from the superseding indictment. With a guideline range of 70 to 87 months' imprisonment, the district court granted a downward variance of nearly four years and imposed a sentence of two years' imprisonment. The district court also imposed restitution as the same loss amount Boutte caused Lowe to be paid, a total of $1,210,000.

Boutte timely appealed his conviction and sentence. Spanning about twenty different grounds, he raises three categories of arguments: (1) constitutional challenges against his indictment and conviction, (2) challenges to what occurred at trial, and (3) challenges to what occurred at sentencing. We address each in turn.

## II.

To begin, Boutte brings several constitutional challenges. He argues that his indictment and conviction violate (A) the Ex Post Facto Clause, (B) substantive due process, and (C) procedural due process. As we explain, no such violations occurred.

3

**A.**

Boutte argues on appeal that his indictment and conviction violate the Ex Post Facto Clause. But the government responds that we need not actually deal with the merits of this challenge because Boutte's Ex Post Facto argument is "undeveloped and unpreserved." Aple. Br. at 16. We agree with the government.

"We ordinarily deem arguments that litigants fail to present before the district court but then subsequently urge on appeal to be forfeited." *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1259 (10th Cir. 2018). We review such forfeited arguments for plain error. *See id.* at 1260. However, when a litigant "also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). Such a circumstance "marks the end of the road for an argument . . . not first presented to the district court." *Id.* (citation omitted); *see McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010) (Gorsuch, J.) ("[E]ven if [a litigant's] arguments were merely forfeited before the *district court*, her failure to explain in her opening appellate brief why this is so and how they survive the plain error standard waives the arguments in *this* court.").

In our review of the record, we cannot find any mention of an Ex Post Facto challenge made below. And the parts of the record that Boutte points us to do not concern the Ex Post Facto Clause, nor do they challenge the laws under which he was convicted. *See* Reply Br. at 2–4. Instead, Boutte directs us to look at irrelevant discussion, in which the district court explained why Boutte's indictment does not

4

require analysis of 18 U.S.C. § 1913 and the supposed "regulatory due process" that § 1913 provides. *Id.* at 3 (citation omitted). *That* discussion does not revolve around an Ex Post Facto violation but a different issue altogether.

Other than that, Boutte cites to a supplemental authority submitted below that mentions that a "specific regulatory due process . . . needed to be followed" under regulations promulgated pursuant to § 1913. Aplt. Supp. App'x at 2. Even if this brief discussion of procedural regulatory rights did refer to the Ex Post Facto argument he makes on appeal (it does not), "his passing reference" would be "so vague and poorly developed that it [would] not [be] sufficient to preserve his argument for appeal." *United States v. Barrera-Landa*, 964 F.3d 912, 918 n.4 (10th Cir. 2020).

In the end, Boutte did not sufficiently raise an Ex Post Facto challenge below, nor did he even challenge the statutes under which he was actually charged—only a lobbying statute that is not at issue in this appeal. Because Boutte also does not argue his forfeited argument in a plain-error context, he has waived the challenge altogether. *Leffler*, 942 F.3d at 1196.

## B.

Boutte next raises two substantive due process claims, the first dealing with his conviction in general, the second dealing more specifically with the exclusion of testimony at trial. Importantly here, the failure to adequately brief an argument, by making conclusory statements and providing unhelpful citations, results in the waiver of an argument. *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d

5

1152, 1169 (10th Cir. 2002) (deeming an argument "waived for failure to brief" because the appellants "fail[ed] to explain" their argument); *Moore v. Gibson*, 195 F.3d 1152, 1180 n.17 (10th Cir. 1999) ("We do not consider unsupported and undeveloped issues."). Boutte's briefing on substantive due process (not to mention several other issues) runs into this problem.

In mischaracterizing what he was convicted of, Boutte claims that "the Government charging lobbying activity as a crime" is "criminalization of non-criminal activity" that "violates the Constitution's . . . notions of substantive Due Process." Aplt. Br. at 20, 24. That is all he provides in support of this point. He fails to provide relevant citations and does not explain how the elements of a substantive due process claim are met.

Even taken at its best, Boutte's reasoning boils down to the Government disregarding certain procedural protections before charging him with criminal conduct. But in making this argument, Boutte "confuses" *procedural* due process with *substantive* due process. *Brown v. Montoya*, 662 F.3d 1152, 1172 n.16 (10th Cir. 2011). With those procedural due process arguments aside, Boutte does not sufficiently explain on appeal how a *substantive* due process violation occurred. As such, he waives his substantive due process claim. *See Utahns for Better Transp.*, 305 F.3d at 1169.

Boutte's second substantive due process argument runs into the same problem as his first. He argues that the district court violated his substantive due process rights when it denied his motion for a new trial based on "new evidence," that being,

6

an affidavit from a man named Rod Tinney, who did not testify at trial.  Aplt. Br. at 25.  Without citing any case that indicates that something like what happened here could amount to a substantive due process violation, he makes conclusory claims that the court's evidentiary decision violated substantive due process.  As before, his inadequate briefing of this argument results in its waiver as conclusory, unsupported, and undeveloped.  *See Utahns for Better Transp.*, 305 F.3d at 1169.  Thus, both of Boutte's substantive due process claims fail.

## C.

Boutte next turns to procedural due process for relief.  He argues that the delay of his charges and conviction created a procedural due process violation.

We review a district court's ruling on a motion to dismiss based on pre-indictment delay for abuse of discretion and the court's underlying factual findings for clear error.  *United States v. Garcia*, 74 F.4th 1073, 1094–95 (10th Cir. 2023).  "[D]ismissal of indictments for preindictment delay" is warranted "only in exceptional circumstances."  *United States v. Comosona*, 848 F.2d 1110, 1113 (10th Cir. 1988).  A defendant must show:  (1) "actual prejudice resulting from the preindictment delay" and (2) "that the delay was purposefully designed to gain tactical advantage or to harass the defendants."  *United States v. Revada*, 574 F.2d 1047, 1048 (10th Cir. 1978) (citation omitted).

Proving actual prejudice requires the defendant to prove that "the government's delay *actually* prejudiced him; speculative surmise about what the evidence *might* have shown but for the government's delay is not enough."  *United*

*States v. Koch*, 444 F. App'x 293, 298 (10th Cir. 2011) (Gorsuch, J.); *see United States v. Lovasco*, 431 U.S. 783, 790 (1977) ("[P]roof of prejudice is generally a necessary but not sufficient element of a due process claim.").  Thus, simply because "any extended delay" brings a "real possibility of prejudice"—"that memories will dim, witnesses become inaccessible, and evidence be lost"—such possibilities "are not in themselves enough to demonstrate that [criminal defendants] cannot receive a fair trial and to therefore justify the dismissal of the indictment."  *United States v. Marion*, 404 U.S. 307, 326 (1971).

Boutte argues that the relevant statute of limitations barred him from being charged or convicted, though he acknowledges that tolling should apply under the Wartime Suspension of Limitations Act.[1]  Aplt. Br. at 31–32.  Despite that the indictment fell within the applicable statute of limitations, *see* App'x Vol. I at 289, Boutte argues that the government violated his procedural due process rights by delaying his charges.  He fails to meet his burden in bringing this challenge.

Crucially, Boutte does not show actual prejudice.  *Cf. Lovasco*, 431 U.S. at 790.  Aside from conclusory statements that "[t]he effects . . . were felt throughout the case," Aplt. Br. at 34, Boutte does not provide anything more than "speculative surmise about what the evidence might have shown but for the government's delay." *Koch*, 444 F. App'x at 298.  And that, of course, "is not enough." *Id.*; *see Marion*,

---

[1] 18 U.S.C. § 3287 tolls the statute of limitations for the crimes here.  18 U.S.C. § 3287 (covering "any offense [] involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not").

404 U.S. at 326. Boutte does not point to the record or otherwise specify what evidence he lost or how such evidence would have impacted the trial. Because he fails to demonstrate prejudice, we stop there. *Lovasco*, 431 U.S. at 790. No abuse of discretion occurred. *Garcia*, 74 F.4th at 1094–95.

## III.

Boutte's next category of issues on appeal concern evidentiary challenges to what occurred at trial. He argues that the district court abused its discretion by (A) excluding three exhibits and (B) permitting three witnesses to testify while excluding one expert's proffered testimony. For the reasons explained, we disagree and hold that the court acted within its discretion.

## A.

Boutte begins his evidentiary challenges by objecting to the district court's rulings on the admittance of three exhibits. We review district court evidentiary rulings for abuse of discretion. *United States v. Curtis*, 344 F.3d 1057, 1067 (10th Cir. 2003). To reverse a decision, a defendant must show that the decision was "manifestly erroneous." *United States v. McPhilomy*, 270 F.3d 1302, 1312 (10th Cir. 2001) (citation omitted).

## 1.

Boutte first argues that the district court abused its discretion in excluding Defendant's Exhibit 394—a Department of Army Memorandum that outlined how a contractor, Ron Unruh, had not properly performed his duties. Specifically, the

memorandum states that Unruh "misrepresented himself as a government employee on numerous occasions," among other similar misdeeds.  App'x Vol. II at 74.

The district court excluded Exhibit 394 under Federal Rule of Evidence 403. Under that rule, district courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  "Unfair prejudice in the Rule 403 context 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) (citation omitted).  "In engaging in the requisite balancing, courts give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."  *United States v. Alfred*, 982 F.3d 1273, 1282 (10th Cir. 2020) (citation omitted).

Even so, on appeal, we "will not disturb a defendant's conviction based on erroneous admission of evidence if the error is harmless."  *United States v. Cordova*, 25 F.4th 817, 828 (10th Cir. 2022).  And a "non-constitutional error, such as a decision whether to admit or exclude evidence, is considered harmless unless a substantial right of a party is affected."  *United States v. Chavez*, 976 F.3d 1178, 1204 (10th Cir. 2020) (cleaned up).  To affect a substantial right and therefore warrant reversal, the error must "ha[ve] a substantial influence on the outcome of a trial or leave[] one in grave doubt as to whether it had such effect."  *United States v. Richter*, 796 F.3d 1173, 1197 (10th Cir. 2015).  In making this determination, we will

"not consider the error in isolation, but rather . . . in the context of the entire record." *Chavez*, 976 F.3d at 1204 (citation omitted). Our analysis then involves an examination of: (1) the context, timing, and use of the erroneously admitted evidence at trial, (2) how that evidence compares to properly admitted evidence, and (3) whether the district court's instructions to the jury mitigated the error. *Id.* And the government bears the burden to establish the harmlessness of any error. *Id.*

The district court initially denied the memo admission, finding the document "basically cumulative." App'x Vol. XII at 95 ("I'll just say 394 is basically cumulative, . . . but I'll take that issue up later."). But after briefing, the court found the document more prejudicial than probative under Federal Rule of Evidence 403 because it "wasn't reliable and could lead to [jury] confusion." App'x Vol. XIII at 16. In making that conclusion, the court reasoned that the document was "not a final adjudication," though it spoke as if it was. *Id.* The court was next "concerned that [the memo] was commissioned with an end result in mind," which the court found "problematic in and of itself." *Id.* Lastly, the court noted that Boutte failed to address the court's concerns with the memo's false sense of authority. *Id.* The memo featured "the Army's official letterhead," even though it was not an official document. *Id.*

Boutte has trouble proving that the district court's reasoning was "manifestly erroneous." *McPhilomy*, 270 F.3d at 1312 (citation omitted). Although Boutte asserts that the memorandum is highly probative, critically, he fails to address any of the district court's reasoning that the memorandum was more prejudicial than

11

probative. *See id.* By forgoing any analysis against prejudice, he fails to show how the district court could have abused its discretion. *See Starkey ex rel. AB v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1252 (10th Cir. 2009) ("When an appellant does not challenge a district court's alternate ground for its ruling, we may affirm the ruling."). And as the district court reasoned, the memo's potential probative value does not change its lack of credibility. Thus, the district court did not abuse its discretion in finding the memo inadmissible based on prejudice. And we affirm on that unchallenged ground. *See id.*

The only possible response that Boutte raises is that the reasons for prejudice that the district court pointed to do not rise to the level of *unfair prejudice. United States v. Isabella*, 918 F.3d 816, 837 (10th Cir. 2019) ("Unfair prejudice means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." (cleaned up)). But that is simply not the case. As the district court acknowledged, the memo had problems with its credibility and authority, which the court found could "lure the factfinder" to rely on the memo as an "improper basis." *Id.* (citation omitted); *see* App'x Vol. XIII at 16–17. As such, the district court did not abuse its discretion in denying the introduction of Exhibit 394, and we need not decide whether the exclusion was harmless.

## 2.

Next, Boutte argues that the district court abused its discretion in excluding Defendant's Exhibit 85—a portion of a United States Army field manual that discusses electronic warfare. The district court sustained an objection that the

12

manual was irrelevant, thereby excluding the exhibit. Boutte claims that the manual proves that "electronic warfare efforts from the [Big Crow Program Office] were intelligence and counter-intelligence efforts." Aplt. Br. at 43. Had the district court admitted the manual, he contends that the document would have provided an affirmative defense for Boutte under a lobbying statute he was not convicted under, 18 U.S.C. § 1913. *Id.*

The standard of relevance "is a liberal one." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993). Under Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action." Fed. R. Evid. 401.

Boutte makes the same mistake here as he did with his constitutional challenges. To make things clear: the government did *not* charge Boutte with a violation under 18 U.S.C. § 1913. Rather, his charges only related to conspiring to commit wire fraud and to defraud the United States. And Boutte does not explain how the manual relates to those charges. Nor could he. Nothing in those charges required the Government to otherwise prove that it was illegal for Boutte to hire a lobbyist to convict him. That being so, no affirmative defense applies, or at least, Boutte does not specify what affirmative defense he could have advanced or how the field manual could have helped him otherwise.

Thus, even though the standard of relevance "is a liberal one," *Daubert*, 509 U.S. at 587, the district court did not abuse its discretion in excluding the manual

13

because Boutte's reason for introducing the manual was "of [no] consequence in determining the action." Fed. R. Evid. 401. Given that the district court did not abuse its discretion in denying the introduction of Exhibit 85, we need not analyze whether the exclusion was harmless.

**3.**

Boutte also claims that the district court abused its discretion in excluding Defendant's Exhibit 113—a job posting, issued in 2021, from the United States Agency for International Development, soliciting applications for a "Congressional Liaison Advisor." As before, to determine whether a district court abused its discretion on the relevance of evidence, we look to Federal Rule of Evidence 401 and the caselaw surrounding that rule. And under Rule 403, district courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other things, "confusing the issues" or "misleading the jury." Fed. R. Evid. 403.

Arguing in favor of Exhibit 113's relevance, Boutte says that the job posting would have helped him show that "congressional liaisons and lobbyists are the same" and "that lobbying was not illegal." Aplt. Br. at 44. But as the district court found, that is not the case. The document only used the word "liaison," not "lobbyist." App'x Vol. XI at 221 ("They are not the same word."). The document did not define, or even mention, lobbying or lobbyists. That is why the district court sustained the objection that a "liaison" and someone who "lobbies" are "different distinct things." *Id.* at 218, 225. Thus, the district court acted within its discretion when it concluded

14

that the manual did not have "any tendency to make a fact more or less probable than it would be without the evidence."  Fed. R. Evid. 401.

That all aside, Boutte's challenge faces an even bigger problem—one Boutte does not discuss.  Like before, he does not respond to the district court's reasoning under Federal Rule of Evidence 403.  In addition to relevance, the court had reasoned that the document had "much more potential to confuse the jury than to aid them in their understanding of the issues."  App'x Vol. XI at 221; *see id.* ("This is a 2021 document, there's no evidence that he's using the term 'Lobbying' in the sense that he understand it as issuance of that document as opposed to what he thought back then, so I think that this is a document that sheds very little light on the issues in this case today[.]").

Because Boutte did not challenge the district court's reasoning, we also affirm the district court's exclusion of the manual on this alternate ground.  *See Starkey ex rel. AB*, 569 F.3d at 1252 (recognizing that "we may affirm the ruling" when an appellant fails to "challenge a district court's alternate ground for its ruling").  Because the district court did not abuse its discretion in denying the admission of Exhibit 113, we do not need to analyze whether the exclusion was harmless.

## B.

Boutte next challenges the district court's rulings on the testimony of four witnesses.  We review a "district court's decision to admit expert or lay testimony . . . for abuse of discretion."  *United States v. Brooks*, 736 F.3d 921, 929 (10th Cir. 2013).

To determine relevance, courts look to Federal Rule of Evidence 401. And to assess lay witness testimony and expert witness testimony, we look to Rules 701 and 702, respectively. When a witness does not testify as an expert, Rule 701 limits such testimony to be "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Rule 701 "does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *United States v. Murry*, 31 F.4th 1274, 1294 (10th Cir. 2022) (citation omitted). Such testimony is instead reserved for experts. *See* Fed. R. Evid. 701. But when "the challenged testimony proffer[s] no opinion, lay or expert, but simply the witness['s] personal experience," the witness "need not testify as [an] expert"—even if the witness is an expert. *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002). That is because "the nature and object of their testimony determines whether the procedural protections of Rule 702 apply." *Id.*; *see Vincent v. Nelson*, 51 F.4th 1200, 1213 (10th Cir. 2022) ("[L]ay testimony based on personal experience and observation [is] thus not subject at all to expert-witness disclosure requirements.").

Rule 702 "governs the admissibility of expert opinion testimony." *United States v. Pehrson*, 65 F.4th 526, 540 (10th Cir. 2023); *see* Fed. R. Evid. 702. The rule "imposes on a district court a gatekeeper obligation to 'ensure that any and all

16

scientific testimony or evidence admitted is not only relevant, but reliable.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citation omitted).

**1.**

Boutte argues that the district court abused its discretion by permitting lay witnesses to provide expert testimony over his objections. He also argues that those witnesses' testimonies were irrelevant.

First up, we consider witness Gloria Golden's testimony. Golden worked as a contracting officer at the Department of the Interior when she signed the amendment to a task order that gave Boutte funding for Big Crow. Speaking from her personal experiences, she explained her role and how the designated government technical representative on a contract had to be an actual government employee. When asked about an amendment to the task order she approved, Golden testified that the contract did not put her on notice that a contractor would bill for lobbying services under the contract. After being asked about her understanding of the contract expansion of task orders, Golden clarified that she was "not rendering a legal opinion," but rather "speaking out of [her] own personal experience." App'x Vol. XII at 26.

Boutte argues that Golden's testimony on contracting terms and whether documents suggest lobbying should all be left to an expert because they require technical and specialized knowledge. Yet, in all, Golden's testimony boils down to personal experience and no special knowledge was necessary. She testified that the task order she signed off on did not provide her notice that a contractor would pass on lobbying costs to the government. That was a fact that was rationally based on

17

her "personal experience and observation" of signing off on the task order as a contracting officer. *Vincent*, 51 F.4th at 1213. As such, Golden did not need to testify as an expert. *See id.*; *Caballero*, 277 F.3d at 1247.

Next, Boutte believes that Golden's testimony was "wholly irrelevant" because the task order Golden testified about did not contain Boutte's name or involve him. Aplt. Br. at 47. Thus, Boutte reasons, the task order testimony does not prove that he was connected to the scheme. But that was *not* the fact that the government was trying to prove—for the government had other evidence tying him to the scheme. Instead, the government offered the evidence for the purpose of showing that the task order Golden signed off on did not allow for the lobbying services that the funds ended up funding. *That* fact was "of consequence in determining" Boutte's liability of misused federal funds, and so, Golden's testimony had a "tendency to make [that] fact more . . . probable than it would be without the evidence." Fed. R. Evid. 401. Thus, the district court did not abuse its discretion in overruling an objection to Golden's relevant testimony.

Boutte's other arguments against Golden's testimony merely disagree with the contents of what Golden stated. Because he failed to raise the arguments as proper objections below, he cannot now argue them on appeal in the absence of plain error. *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1460 (10th Cir. 1987). And Boutte does not argue that plain error occurred, which means he cannot raise his objections on appeal. *Leffler*, 942 F.3d at 1196. Accordingly, the district court did not abuse its discretion in admitting Golden's lay testimony.

18

**2.**

Jesse Brennan is the second witness whose testimony Boutte challenges. Brennan served as a contract specialist and contracting officer at the Army Contracting Office based at White Sands Missile Range.  Reflecting on his prior experience, Brennan explained how he detected Ron Unruh acting inappropriately as a government representative and how Brennan tried to put a stop to it.  Brennan explained how he evaluated invoices under the contracts at issue.  And he testified that it was not his practice to approve invoices that reflected fictitious names or work outside the scope of the contract.

In questioning Brennan, the government asked about the individuals listed on the contract.  Specifically, the government asked whether the funds distributed to "straw men" listed on the contract could have been made "payable" to "bill for lobbying services that had been performed in the summer of 2004."  App'x Vol. XI at 180.  Below, Boutte objected that this question called for a legal conclusion.  But the district court overruled the objection, reasoning that Brennan would answer the question based on his experiences on what he would have done "as a contracting officer."  *Id.*  And the court noted that Brennan was not asked "whether the[] [services] were or were not legal."  *Id.*

The district court acted within its discretion.  Brennan did not "testify as [an] expert" or offer a legal opinion.  *Caballero*, 277 F.3d at 1247.  Instead, Brennan's testimony stemmed from his personal experience with the facts, procedures, and operations he knew firsthand.  *See id.*; *Vincent*, 51 F.4th at 1213.  Under these

19

circumstances, no abuse of discretion occurred in how the district court handled Brennan's lay witness testimony.

Moreover, Boutte believes that Brennan's testimony was "wholly irrelevant" because "he never spoke with Mr. Boutte on *any* of the contracts, never met him, or spoke with him." Aplt. Br. at 50. But because Boutte failed to raise this relevance objection below, he cannot raise a relevance objection against Brennan's testimony on appeal in the absence of plain error. *Karns*, 817 F.2d at 1460. And because Boutte does not argue that plain error occurred, he has waived the argument. *Leffler*, 942 F.3d at 1196. All considered, the district court did not abuse its discretion in admitting Brennan's lay testimony.

### 3.

Keith Larson is the third witness that Boutte challenges as having provided expert testimony as a lay witness. First off, the district court admonished the jury that Larson was not an expert witness and only testified "in the context of how he performed his job in relation to the contract [talked] about in this case." App'x Vol. XI at 135–36. Aside from this though, Boutte did not object below to Larson's lay testimony as being either expert testimony or irrelevant. As a result, he cannot raise such objections against Larson's testimony on appeal in the absence of plain error. *Karns*, 817 F.2d at 1460. And as before, Boutte does not argue that plain error occurred, which amounts to a waiver of his arguments on appeal. *Leffler*, 942 F.3d at 1196.

**4.**

Boutte next argues that the district court abused its discretion in excluding defense expert witness Robert Magnuson's proffered testimony. Below, the court had qualified Magnuson, an attorney, as an expert in government contracting. App'x Vol. XVI at 70; *see* App'x Vol. II at 51 ("[A]n expert like Magnuson could be helpful to the trier of fact in wading through the technical terms involved in government contracting."). Although he was not personally involved in the events at issue in trial (the other witnesses discussed above were), the district court allowed Magnuson to testify about the prevailing custom and practice at the time. With that in mind, he testified to the jury about the meaning of contract terms and the roles of various participants in the federal contracting regime.

But as Magnuson's testimony turned away from contract terms to interpreting statutes and regulations, the district court released the jury and allowed Magnuson to proffer testimony. App'x Vol. XV at 230. Boutte intended for Magnuson to testify about how to interpret a lobbying statute and its accompanying regulations. Ultimately, the trial court determined that Magnuson's proffered testimony would be excluded as "inherently legal" and "very confusing." App. Vol. XV at 230.

On appeal, Boutte chooses to solely challenge the district court's finding that the proffered testimony was "confusing," not the court's alternative ground that it was "inherently legal." *Id.*; *see* Aplt. Br. at 58 ("Ultimately, the trial court determined that Mr. Magnuson's proffer would be excluded as confusing and would not be helpful to the jury."); *id.* (omitting the ruling that the testimony would be

21

"inherently legal"). The court discussed its reasoning on this alternative ground at trial. App'x Vol. XV at 230 ("The bottom line is [that Magnuson's testimony is] inherently legal. As I sat here, it was a -- it was sort of a law school class for me for how the law is to be interpreted . . . . [I]t's improper expert testimony in this case."). And the court reiterated its reasoning in an order. App'x Vol. II at 75 ("Magnuson will not be allowed to testify as to ultimate conclusions or items that invade the province of the jury or which are nothing more than improper commentary on the evidence.").

Importantly, experts cannot provide *legal* testimony, such as legal conclusions, because such testimony invades the province of the trial judge. *United States v. Vreeken*, 803 F.2d 1085, 1091 (10th Cir. 1986) ("[Q]uestions of law are the subject of the court's instructions and not the subject of expert testimony."). For that reason, courts can rightfully deny an expert witness's legal testimony on "his or her opinion as to legal standards" or "legal conclusions drawn by applying the law to the facts." *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998). Thus, "when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed." *Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) (en banc).

Magnuson sought to do just that, informing the district court that "appropriations statutes allowed for appropriated dollars to be used on a contract where the contract asks the contractor to approach and lobby Congress for money on behalf of the agency, as long as it is not directly to the contract in which they are

22

seeking." Aplt. Br. at 58 (citing App'x Vol. XV at 181). Given that Magnuson's testimony was legal in nature, the district court did not abuse its discretion in excluding the testimony.

Because Boutte has not responded to this proper ground for denying Magnuson's proffered testimony, we may affirm the ruling on the testimony without addressing the district court's other reasons. *Rivero v. Bd. of Regents of Univ. of N.M.*, 950 F.3d 754, 763 (10th Cir. 2020) ("If the district court states multiple alternative grounds for its ruling and the appellant does not challenge all those grounds in the opening brief, then we may affirm the ruling.").

The only possible response Boutte offers is that the district court abused its discretion because it allowed other witnesses to testify "extensively with respect to the issues as in Mr. Magnuson's proffer." Aplt. Br. at 54. But Boutte provides no citation or quote of other witnesses testifying about how to interpret a statute. And we need not go on a treasure hunt through the record to fill in the apparent gaps in his argument. For these reasons, the district court did not abuse its discretion in excluding Magnuson's proffered expert testimony.[2]

---

[2] We note that in a catchall paragraph, Boutte argues that some of the constitutional and evidentiary errors analyzed above affected his substantial rights and were not harmless. Aplt. Br. at 60–61. Because we find no error to begin with—constitutional, evidentiary, or otherwise—we need not assess whether any of his alleged errors were harmless. *See United States v. Freeman*, 70 F.4th 1265, 1286 (10th Cir. 2023).

### IV.

Boutte's last category of challenges relates to his sentencing. He argues that the district court erred by (A) misapplying the credits-against-loss rule; (B) consulting on an ex parte basis with a probation officer about what medical services a prison can provide; and (C) not departing from the Sentencing Guidelines after considering the special factors Boutte presented. Ultimately, each challenge fails.[3]

### A.

Boutte first argues that the district court clearly erred by misapplying the credits-against-loss rule under the Sentencing Guidelines. This Court reviews the district court's fact findings for a loss calculation for clear error and its loss calculation methodology de novo. *United States v. Washington*, 634 F.3d 1180, 1184 (10th Cir. 2011).

At sentencing, the district court found that a 14-level increase applied under the Guidelines after calculating the loss amount as "more than $550,000 and less than $1.5 million." R. 435, Sentencing Transcript, at 161; *see* U.S.S.G. § 2B1.1(b)(1)(H).

---

[3] As the government points out, Boutte failed to provide this Court with a sentencing transcript. Aple. Br. at 49 n.7. He only cited the sentencing minute sheet. *See* Aplt. Br. at 63 (citing App'x Vol. IV at 7–9). We recognize that if the record provided to us is "insufficient," we are required to affirm the judgment below. *United States v. Brody*, 705 F.3d 1277, 1281 (10th Cir. 2013). But because the sentencing transcript is readily available to us, we exercise our discretion to overlook counsel's carelessness and take judicial notice of the district court's filings. *See, e.g.*, *Bunn v. Perdue*, 966 F.3d 1094, 1096 n.4 (10th Cir. 2020) (recognizing this Court's discretion to consider material that was before the district court); *United States v. Holloway*, 939 F.3d 1088, 1104 n.10 (10th Cir. 2019) (same).

The court arrived at that range based on the $1.21 million that Boutte fraudulently misappropriated from the federal government to pay Lowe for lobbying services.

The Sentencing Guidelines explain how courts can calculate "loss" against a "victim." *See* U.S.S.G. § 2B1.1. They define "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)." *Id.* § 2B1.1 cmt. n.1. And the Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. n.3(A)(i). The Guidelines then provide that sentencing courts must decrease the actual loss amount in certain circumstances. Indeed, under the Guidelines' "Credits Against Loss" commentary, actual loss "shall be reduced" by "the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." *Id.* § 2B1.1 cmt. n.3(E)(i).

The district court did not clearly err when it found the government's loss to be $1.21 million—i.e., the amount of money Boutte fraudulently used to pay Lowe for services that the government did not authorize. To begin, as the district court concluded, the United States government is the "victim" of Boutte's crimes. Both of Boutte's convictions—conspiracy to defraud on the one hand and conspiracy to commit wire fraud on the other—harmed the same victim: the United States. R. 435, Sentencing Transcript, at 161–62; *see* 18 U.S.C. § 286 (imposing fines or imprisonment on those who "enter[] into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof"); 18 U.S.C. §§ 1343, 1349 (criminalizing a conspiracy to transmit or cause wire transmissions in

25

interstate commerce for purposes of executing a scheme to defraud and obtain money from the United States by means of false and fraudulent pretenses or representations). Given that the jury found Boutte guilty of these offenses, the "victim" is the United States because it "sustained" all "of the actual loss" caused by Boutte's scheme. U.S.S.G. § 2B1.1 cmt. n.1. Therefore, the district court did not clearly error in finding that the United States is the victim here.[4]

Next, the district court did not clearly error in calculating actual loss or in applying the Guidelines' credits-against-loss rule. The actual loss in this fraud case totals the amount of federal funds that Boutte caused to be misappropriated. That amount was "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. n.3(A)(i). And neither Boutte nor any others in the scheme rendered services that would alter that amount. *Id.* § 2B1.1 cmt. n.3(E)(i).

Against this, Boutte raises two arguments. Boutte argues that the loss amount was not attributable to him because he was "not personally involved in fashioning those false claims." Aplt. Br. at 63. But this argument does not account for what actual loss includes, as provided by the Guidelines. Again, actual loss means "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). Thus, whether Boutte personally fashioned those false claims

---

[4] Boutte argues that the district court should not have calculated loss in the first place because the government did not identify a specific agency as a victim, only the "United States Federal Government" as a whole. Aplt. Br. at 62. But Boutte provides no authority or reference in the Guidelines that supports why the victim here cannot be the United States. As stated, the very statutes that a jury convicted Boutte under include crimes that target the United States as a victim.

or not is irrelevant.  When Boutte caused others to pay Lowe with government funding meant for other purposes, every dollar misappropriated amounted to a reasonably foreseeable harm caused by Boutte.  *See id.*

Next, relying on U.S.S.G. § 2B1.1 cmt. n.3(E)(i), Boutte argues that the district court erred in applying the credits-against-loss rule.  He reasons that the court should have offset the loss by the $8.2 million that Lowe redirected to Big Crow as a result of lobbying services.  In all, Boutte believes that the government did not actually lose anything because the government got more than he misappropriated initially.

Boutte's logic only goes so far.  That is because, again, neither Boutte nor Lowe "rendered" any "fair market value" from the lobbying services.  *Id.* § 2B1.1 cmt. n.3(E)(i).  As the district court recognized, Lowe's services did not raise any money for the government; rather, they merely redirected already-existing government funds that would have been used by another agency.  *See, e.g.*, R. 435, Sentencing Transcript, at 84 ("[Lowe] didn't get anything for the Government because the money came from the Government and it ostensibly went to the Government for use in a program minus 1.2 million for Lowe.").  No "value" existed from Lowe's services that would "reduce[]" the actual loss caused by Boutte's scheme.  U.S.S.G. § 2B1.1 cmt. n.3(E)(i).  The value to the government remained the same; its money just shifted around.  Therefore, the district court did not clearly err in calculating actual loss or applying the credits-against-loss rule.

27

**B.**

In challenging the district court's decision to sentence Boutte to prison rather than home confinement, Boutte asserts that the court erred when it consulted a probation officer on an ex parte basis about what medical services a prison can provide.

He reasons that after a probation officer communicated with the district court at sentencing, the court believed that the prison where Boutte would serve his sentence could care for him. R. 435, Sentencing Transcript, at 145; *see id.* at 174 ("The Federal prisons provide a broad range of medical care, specifically including treatment for defendant's issues such as cardiovascular disease, diabetes and hypertension. Nothing in defendant's motion for departure indicates how the Bureau of Prisons will be unable to provide him with the level of care he currently receives.").

Without citing to any authority, Boutte argues that his probation officer was not allowed to represent to the district court that the prison could care for him, that he did not know what the officer said, and that he did not get a chance to cross-examine the officer. Even overlooking his inadequate briefing on this issue, this Circuit has long allowed probation officers to communicate ex parte with a sentencing court. *See, e.g.*, *United States v. Davis*, 151 F.3d 1304, 1306 (10th Cir. 1998) ("Because of the 'close working relationship between the probation officer and the sentencing court,' the probation officer may communicate ex parte with the district court[.]" (citation omitted)). Boutte provides no authority that constrains that communication

28

or requires some sort of disclosure of such communication to the defendant.  As such, Boutte fails to identify an error.

## C.

Lastly, Boutte argues that the sentencing court erred when it did not depart from the Sentencing Guidelines after considering the special factors Boutte presented.  But we cannot analyze this issue.  That is because we have "no jurisdiction [] to review a district court's discretionary decision to deny a motion for downward departure."  *United States v. Sierra-Castillo*, 405 F.3d 932, 936 (10th Cir. 2005).  And Boutte does not claim that an exception applies here.  *Cf. United States v. Fonseca*, 473 F.3d 1109, 1112 (10th Cir. 2007) ("This court may review a denial of a downward departure only if the denial is based on the sentencing court's interpretation of the Guidelines as depriving it of the legal authority to grant the departure.").  Consequently, we deny review of this issue because we lack jurisdiction.

In response, Boutte attempts to argue that the government mischaracterized his argument, claiming instead that the "trial court misapplied case law to deny Mr. Boutte a downward departure."  Reply Br. at 20.  Even if that were what Boutte argued, he does not explain why we would have jurisdiction over this issue when our precedent indicates that we do not.  He does not explain how the court misapplied a case.  Nor does he cite a single case that the district court supposedly misapplied.  That being so, even if we consider how Boutte characterizes his argument in his

29

Reply Brief, he has waived the issue "by inadequately briefing it." *Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019).

**V.**

For these reasons, we AFFIRM.

Entered for the Court

Allison H. Eid
Circuit Judge